Gerald **YARNELL, M.D., David Steiman, M.D., John R. Scott, M.D., and Richard A. Hutson, M.D., Appellants (Defendants Below),**

v.

Karen D. **HURLEY, Administratrix of the Estate of Meredith Clark Hurley, Deceased, Appellee (Plaintiff Below).**

No. 29A02–9010–CV–576.[1]

Court of Appeals of Indiana,
Third District.

June 11, 1991.

---

Joe Tipton, Steven J. Cohen, Tipton Cohen & Koch, Indianapolis, for appellants, Gerald Yarnell, M.D., John R. Scott, M.D., and Richard A. Hutson, M.D.

Mary M. Lueders, Kevin Charles Murray, Locke Reynolds Boyd & Weisell, Indianapolis, for appellant, David Steiman, M.D.

Russell T. Clarke, Jr., Emswiller, Williams, Noland & Clarke, Indianapolis, for appellee.

STATON, Judge.

Gerald Yarnell, M.D., David Steiman, M.D., John R. Scott, M.D., and Richard A. Hutson, M.D. (collectively, "Doctors") bring this interlocutory appeal from the denial of their motion for summary judgment. The sole issue for our determination is whether the statute of limitations has run on the plaintiffs' claim.

We reverse.

In February of 1986, Meridith Hurley went to see Dr. Steiman, complaining of pain in his left arm and neck. Steiman diagnosed Hurley's condition as cervical spondylosis and prescribed medication in an attempt to alleviate the problem. Hurley's last contact with Steiman's office was a telephone call on October 22, 1986 regarding a refill of his medication.

When the problem did not resolve itself, Hurley went to see Dr. Scott, a neurologist, who diagnosed the ailment to be medial epicondylitis with irritation of the ulnar nerve, and referred Hurley to Dr. Hutson, an orthopaedic surgeon. After various treatments and a myelogram, Hutson concluded that Hurley required surgery in order to transplant the ulnar nerve. Outpatient surgery was performed at Methodist Hospital on November 25, 1986. After the surgery, though the incisional area healed without complications, Hurley continued to complain of pain. Hutson recommended an exercise program.

On a vacation in December of 1986, Hurley experienced pain and swelling throughout his left arm, forearm, and hand. He was seen by a neurologist in Florida, who concluded that he had reflex sympathetic dystrophy.

Upon returning from Florida, Hurley continued to experience pain in his left upper extremities. Various treatments were employed in an attempt to alleviate the pain. These included sympathetic blocks administered by Dr. Yarnell, an anesthesiologist. Hurley last saw Hutson on February 2, 1987, Scott on January 23, 1987, and Yarnell on February 21, 1987. On March 9, 1987, Hurley was admitted to Methodist Hospital complaining of shortness of breath. He was diagnosed as suffering from lung cancer. On June 8, 1987, Hurley died of respiratory failure, pneumonia, infection, and a massive tumor caused by the lung cancer. Approximately one week after Hurley's death, his widow learned of a possible connection between his ailments and the lung cancer.

On March 17, 1989, Hurley's estate (Estate) filed a proposed complaint with the Indiana Department of Insurance pursuant to the Medical Malpractice Act. The complaint was amended several times; however, each version contained the following allegations of negligence:

6. That each of the Defendants and/or all of them committed each of the following:

a) Failed to diagnose the cancerous (malignant) condition from which the decedent suffered.

b) Failed to treat said malignant condition.

c) Improperly diagnosed the decedent as suffering from certain orthopedic and neurologic conditions from which the decedent did not in fact suffer.

d) That said improper diagnosis resulted in the decedent undergoing unnecessary and painful diagnostic and surgical procedures.

e) Prescribed and administered unnecessary and improper medications to the decedent.

The final version was filed in the Hamilton County Circuit Court for the trial judge to make a preliminary determination pursuant to the provisions of the Medical Malpractice Act of whether the complaint should be dismissed due to the running of the statute of limitations. The court treated the Doctors' motions as motions for summary judgment and denied each, as well as Dr. Steiman's motion to reconsider. The trial court certified the order for appeal, and this court accepted the Doctors' interlocutory appeal.

■ The resolution of this controversy entails an examination of the statute of limitations for the Medical Malpractice Act. Indiana Code 16–9.5–3–1(a) (1988) provides in relevant part:

No claim, whether in contract or tort, may be brought against a health care provider based upon professional services or health care rendered or that should have been rendered unless filed within two (2) years from the date of the alleged act, omission, or neglect....

The statute is an "occurrence" statute, i.e. it begins running from the date of the alleged malpractice, not when the malpractice is discovered. *Cacdac v. Hiland* (1990), Ind., 561 N.E.2d 758, 759. The statute applies, *inter alia*, to wrongful death actions based upon medical malpractice. *Frady v. Hedgcock* (1986), Ind.App., 497 N.E.2d 620, 622, *transfer denied.*

It is clear that the Estate's action against the Doctors, brought on March 17, 1989, was brought more than two years after any act of malpractice, as the latest date that any of the Doctors saw Hurley was

February 21, 1987. However, the Estate argues that the statute of limitations was tolled until after March 17, 1987 pursuant to either the "fraudulent concealment" doctrine or the "continuing wrong" doctrine.

The fraudulent concealment doctrine was described in *Hospital Corp. of America v. Hiland* (1989), Ind.App., 547 N.E.2d 869, 873:

The doctrine of fraudulent concealment operates to estop a defendant from asserting a statute of limitations defense when that person, by deception or a violation of a duty, has concealed material facts from the plaintiff thereby preventing discovery of a wrong. Thus, equitable estoppel can arise either from active efforts to conceal the malpractice or from failure to disclose material information when a fiduciary or confidential relationship exists between the physician and patient. The physician's failure to disclose that which he knows, or in the exercise of reasonable care should have known, constitutes constructive fraud. This constructive fraud terminates at the conclusion of the physician-patient relationship at which time the statute of limitations begins to run. The statute will also commence to run after a patient learns of the malpractice, or discovers information which would lead to the discovery of the malpractice if the patient exercises reasonable diligence. Fraudulent concealment thus tolls the running of the statute of limitations until either the physician-patient relationship is terminated or the patient discovers the malpractice or learns information which in the exercise of due diligence would lead to the discovery of the malpractice.

Under the fraudulent concealment doctrine, however, the plaintiff does not have two full years from the discovery of the alleged malpractice in which to file a claim. Rather, the law places upon a plaintiff the responsibility to institute an action within a reasonable time after discovery of the alleged malpractice.

(Citations omitted). Our supreme court affirmed the court of appeals decision and

expressed its approval of this language by adopting the opinion in *Cacdac, supra.*

It is clear from the above language that the Estate is not relieved from the bar of the statute by the fraudulent concealment doctrine. First, Hurley was diagnosed with lung cancer on March 9, 1987. Thus, at that point he had "learn[ed] information which in the exercise of due diligence would lead to the discovery of the malpractice." *Hospital Corp., supra; Walters v. Rinker* (1988), Ind.App., 520 N.E.2d 468, 474 at n. 1, *transfer denied.* Second, even assuming that the statute was tolled until June 8, 1987, the date of Hurley's death,[2] the Estate did not file suit until March 17, 1989, over twenty-one months later. Under the fraudulent concealment doctrine, the plaintiff does not have a new two year period, but must bring suit within a reasonable time. *Hospital Corp., supra.* This court has found similar periods of time to constitute unreasonable delay as a matter of law. *Spoljaric v. Pangan* (1984), Ind.App., 466 N.E.2d 37, 45, *transfer denied* ("well over a year"); *Cyrus v. Nero* (1989), Ind.App., 546 N.E.2d 328, 331 (twenty-two months). We do not find this case to be distinguishable from those cited.[3]

The continuing wrong doctrine was outlined in *Hospital Corp., supra:*

The doctrine of continuing wrong is applicable where an entire course of conduct combines to produce an injury. When certain conduct is determined to constitute a continuing wrong, the statute of limitations is tolled so that it does not commence running until the wrongful act ceases.

*Id.* at 876 (citations omitted). Continuing wrong in the present context contemplates continuing negligent conduct throughout the physician/patient relationship. The physician/patient relationship does not necessarily end at the time of the last consultation. *Adams v. Luros* (1980), Ind.App., 406 N.E.2d 1199, 1203, *reh'g denied.*

Here, the only negligent acts alleged which could be of a continuing nature are the failure to diagnose and treat the lung cancer. Hurley was diagnosed with lung cancer on March 9, 1987, and began to be treated for it by another doctor. Thus, while the physician/patient relationship may have continued beyond that date (see the factors outlined in *Adams, supra*), there was no "continuing wrong" after that point. Even if the statute was tolled until March 9, 1987, the Estate's action was barred at the time of filing on March 17, 1989.

Accordingly, we hold that the trial court erred in not granting the Doctors' motions for summary judgment.

Reversed.

SHIELDS and BAKER, JJ., concur.

---

2. The duty to disclose an incorrect diagnosis ceases with the termination of the physician-patient relationship. *Walters, supra,* at 474; *Hospital Corp., supra.*

3. The Estate argues that Doctors have waived their reliance on the "laches defense" by failure to raise it in their appellants' briefs, and therefore are barred from raising it in their reply briefs. Clearly, Doctors do not raise laches, but simply argue the proper application of the fraudulent concealment doctrine, raised by the Estate in the appellee's brief. The Estate's waiver argument has no merit.

