Melody MARTIN, Appellant–Respondent,

v.

Robert W. RICHEY, Jr., M.D.,
Appellee–Petitioner.

No. 53A04–9603–CV–104.

Court of Appeals of Indiana.

Jan. 13, 1997.

Mary A. Findling, Price & Barker, Indianapolis, for Appellant–Respondent.

Gary J. Clendening, Kendra G. Gjerdingen, Bloomington, for Appellee–Petitioner.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Plaintiff-Appellant Melody Martin (Melody) appeals from the trial court's grant of summary judgment in favor of Defendant–Appellee Robert Richey, M.D. (Dr. Richey).

We reverse and remand.

### ISSUES

Three issues are presented for our review, which we consolidate and restate as follows:

1. Whether the trial court erred by finding that the statute of limitations contained in the Indiana Medical Malpractice Act was constitutional.

2. Whether the trial court erred by finding that there were no genuine issues of material fact regarding whether the statute of limitations contained in the Indiana Medical Malpractice Act was tolled by the doctrine of active fraudulent concealment.

### FACTS AND PROCEDURAL HISTORY

Dr. Richey is an obstetrician and gynecologist practicing in Bloomington, Indiana. On

March 13, 1991, Melody went to Dr. Richey's office complaining of a lump in her right breast. Melody reported that while the lump had been there for "a while" and she had it checked before, she was beginning to experience some "shooting pains" from the lump. (R. 195). Dr. Richey was out of town, so Melody was seen by Dr. Richey's nurse, Rose Seguin (Rose). Rose made notes on her examination of Melody indicating that she checked the mass and it felt fibrocystic to her. (R. 195). Notwithstanding, Rose made arrangements for Melody to have a mammogram later that day at the Bloomington Hospital.

The mammography report issued by the radiologist at the hospital included the findings of a benign cyst just above the right nipple and a solid mass in the lower outer quadrant of the right breast. It was also stated in the report that "[b]iopsy may be indicated based on the patient's history of enlargement of this lump." (R. 202). The following day, Rose called Melody to tell her that the mammogram revealed a solid mass in the lower outer quadrant of her right breast and that the radiologist that reviewed her mammogram and ultrasound, recommended that she get a biopsy of the mass. (R. 94). Rose also told Melody that she strongly recommended that Melody not wait to schedule an excisional biopsy with a general surgeon. (R. 94). The following day, Melody telephoned Dr. Richey's office and told Rose that she had scheduled an appointment for an excisional biopsy with Dr. Topolgus on Tuesday, March 19, 1991.

When Dr. Richey returned to his office on Monday, March 18, 1991, Rose discussed Melody's case with him. Rose told Dr. Richey that she examined Melody and felt a firm solid mass in the right outer quadrant of her right breast, that the mammogram and ultrasound revealed a solid mass and that the radiologist recommended an excisional biopsy. Rose also told Dr. Richey that Melody had already scheduled an appointment for an excisional biopsy for the following day. Dr. Richey called Melody on Monday evening, and told her to cancel her appointment for the excisional biopsy, that he would perform a needle aspiration in his office instead.

On March 20, 1991, Melody saw Dr. Richey for the needle aspiration. Dr. Richey first aspirated fluid from the benign cyst. He then made several attempts to get fluid from the solid mass area. On the sixth attempt, he was able to extract a small amount of liquid, but he was unsure whether it came from the solid mass or the surrounding tissue. (R. 168). The pathology report indicated that no malignant tumor cells were present in the specimen drawn by Dr. Richey. (R. 83).

According to Rose, who remained in the room with Melody during the needle aspiration, Dr. Richey did not tell her that she needed to follow-up with an excisional biopsy regardless of the results of the needle aspiration. In fact, Dr. Richey told Melody that he thought the lump was benign. Melody testified that Dr. Richey assured her that the mass was probably fibrocystic breast disease and that she had nothing to worry about. She further testified that Dr. Richey never told her that she needed to follow-up with Dr. Topolgus or have an excisional biopsy. Dr. Richey did not recall who communicated the results to Melody, but he was sure that she was made aware of the results. Regarding his communication with Melody at the time of the procedure, he testified as follows:

The discussion I had with Melody at the time of the aspiration was that we would get the aspiration, and once those results were available that I wanted her to carry on, at least discuss the matter with Dr. Topolgus, either discuss it over the phone or better yet plan to have an office visit with him and go over all these results and determine at that point in time whether she should proceed with a breast biopsy.

(R. 171). Although Dr. Richey steadfastly maintains that he discussed this follow-up care with Melody at the time of the needle aspiration, there is no note in the chart to this effect. In fact, no notes regarding Melody's March 20, 1991, visit were charted. Dr. Richey did not see Melody after that visit. However, Melody continued to see Rose until October of 1991, for hormone replacement therapy.

In April of 1994, Melody experienced increased pain from the lump in her breast and

pain under her right arm. She had a mammogram, which revealed an abnormal mass in the lower outer quadrant of her right breast. A core biopsy resulted in a diagnosis of adenocarcinoma of the breast. On April 15, 1994, Dr. Topolgus performed a right modified radical mastectomy of Melody's right breast. Because there was extensive lymph node involvement, Melody underwent a course of chemotherapy from May of 1994 to September of 1994.

On October 14, 1994, Melody filed her Proposed Complaint for Damages against Dr. Richey with the Indiana Department of Insurance, alleging that Dr. Richey was negligent in his care and treatment due to his failure to diagnose and treat her breast cancer in a timely manner. Melody requested review by the Medical Review Panel of the allegations raised in her complaint pursuant to the Indiana Malpractice Act, Ind.Code 27–12–1–1 *et seq.* On May 19, 1995, Dr. Richey filed a Motion for Preliminary Determination of a Question of Law and Motion to Dismiss, together with a supporting memorandum of law. Dr. Richey essentially argued that Melody's complaint was time-barred by the statute of limitations contained in the Act. Specifically, he stated that the alleged negligence occurred on March 20, 1991; the physician-patient relationship ceased to exist no later than October 2, 1991; and Melody's proposed complaint was not filed until October 14, 1994. Dr. Richey therefore requested that Melody's complaint be dismissed for failure to state a claim upon which relief can be granted because her claim was time-barred by the statute of limitations. On September 18, 1995, Melody filed her opposition to Dr. Richey's motion arguing that the statute of limitations was tolled by the equitable doctrine of fraudulent concealment and that the statute of limitations was an unconstitutional violation of the Indiana and federal due process clauses and Indiana's privileges and immunities clause. Dr. Richey filed his reply in support of summary judgment on October 16, 1995. A hearing was held on November 27,

1995, and the court issued the following ruling on December 27, 1995:

> The court having now reviewed the Petitioner's motion, supporting documents and arguments and the respondent's supporting documents and arguments in opposition thereto and now being fully advised finds that the Petitioner's conduct in performing a needle aspiration on the Respondent's breast on March 20, 1991 and his reporting of a negative result did not amount to active fraudulent concealment as that term is discussed in *Hughes v. Glaese*, 637 N.E.2d 822 (Ind.App. 1 Dist., 1994). Further, the court can find no case in Indiana finding any statute of limitation to be unconstitutional.
>
> The court concludes that the constitutional statute of limitations has not been tolled in the fact[s] of this case. The Respondent is, therefore, time barred from pursuing a medical malpractice claim against Petitioner.

(R. 329).[1] We note that after the trial court issued its ruling and before this case was fully briefed, *Hughes v. Glaese* was vacated on transfer. *See* 659 N.E.2d 516 (Ind.1995).

## STANDARD OF REVIEW

When reviewing motions for summary judgment, we apply the same standard as the trial court. *Gilliam v. Contractors United, Inc.*, 648 N.E.2d 1236, 1238 (Ind.Ct.App. 1995), *trans. denied.* A grant of summary judgment requires that the evidence show that there exists no issue of material fact and that the moving party is entitled to judgment as a matter of law. Ind.Trial Rule 56(C); *Wright v. Carter*, 622 N.E.2d 170, 171 (Ind. 1993). All facts and inferences must be liberally construed in the light most favorable to the nonmoving party. *Haas Carriage, Inc. v. Berna*, 651 N.E.2d 284, 287 (Ind.Ct. App.1995).

When reviewing summary judgment rulings, we may consider only those portions of the pleadings, depositions, answers to inter-

---

1. Clearly, the trial court considered evidence outside of the pleadings and treated Dr. Richey's motion as a summary judgment motion. We will review this case under the Trial Rule 56 standard of review. *See Laux v. Chopin Land Assoc., Inc.,* 615 N.E.2d 902, 904 (Ind.Ct.App.1993), *reh'g denied, trans. denied; Valley Fed. Sav. Bank v. Anderson,* 612 N.E.2d 1099, 1101 (Ind.Ct.App. 1993).

rogatories, admissions, matters of judicial notice, and any other matters designated to the trial court by the moving party for purposes of the motion for summary judgment. T.R. 56(C), (H); *Rosi v. Business Furniture Corp.*, 615 N.E.2d 431, 434 (Ind.1993). The party moving for summary judgment bears the burden of making a prima facie showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Hermann v. Yater*, 631 N.E.2d 511, 513 (Ind.Ct.App.1994), *reh'g denied.* Once the movant satisfies this burden, the burden shifts to the nonmoving party to produce specifically designated facts showing the existence of a genuine issue. *Id.*

## DISCUSSION AND DECISION

### I. Constitutionality of Ind.Code 27–12–7–1(b)

Melody contends that the trial court erred in finding that Indiana's two-year occurrence-based statute of limitations for medical malpractice is constitutional. Specifically, Melody asserts that the limitation violates her due process rights as guaranteed by the fourteenth amendment, her right to open access to the courts as guaranteed by article I, § 12 of the Indiana Constitution, and her right to equal privileges and immunities as contained in article I, § 23 of the Indiana Constitution.[2]

Essentially, Melody contends that Ind. Code 27–12–7–1(b) is unconstitutional because it operates to bar her claim before she knew it existed and before any reasonable person would discover its existence. Melody asserts that the legislature has placed an impossible burden on her by requiring her to bring suit before she knew or reasonably could have known she had been harmed. We agree.

■ The statute of limitations contained in Indiana's Medical Malpractice Act provides in pertinent part as follows:

A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or

health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect, except that a minor less than six (6) years of age has until the minor's eighth birthday to file.

Ind.Code 27–12–7–1(b) (1993) (formerly Ind. Code 16–9.5–3–1(a)). This statute of limitations has repeatedly been described as an "occurrence" statute. *Colbert v. Waitt*, 445 N.E.2d 1000 (Ind.Ct.App.1982); *Havens v. Ritchey*, 582 N.E.2d 792, 794 (Ind.1991) (citing *Cacdac v. Hiland*, 561 N.E.2d 758 (Ind. 1990); *Yarnell v. Hurley*, 572 N.E.2d 1312 (Ind.Ct.App.1991), *trans. denied; Walters v. Rinker*, 520 N.E.2d 468 (Ind.Ct.App.1988), *trans. denied; Frady v. Hedgcock*, 497 N.E.2d 620 (Ind.Ct.App.1986), *reh'g denied, trans. denied* ). The medical malpractice statute of limitations differs from the general tort statute of limitations in that under the former, the statute begins to run at the occurrence of the alleged negligence rather than at the time the alleged negligence is discovered. *Yarnell*, 572 N.E.2d at 1314.

On several occasions over the years, our courts have recognized the "brutal" nature of the occurrence-based statute; however, the statute has repeatedly been upheld in light of the other policy goals furthered by it. *See e.g. Hughes*, 659 N.E.2d 516; *Havens*, 582 N.E.2d 792; *Jones v. Cloyd*, 534 N.E.2d 257 (Ind.Ct.App.1989); *Rohrabaugh v. Wagoner*, 274 Ind. 661, 413 N.E.2d 891 (1980); *Carmichael v. Silbert*, 422 N.E.2d 1330 (Ind.Ct. App.1981); *Nahmias v. Trustees of Indiana University*, 444 N.E.2d 1204 (Ind.Ct.App. 1983); *Johnson v. St. Vincent Hosp.*, 273 Ind. 374, 404 N.E.2d 585 (Ind.1980).

#### A. Equal Privileges

##### The Indiana Constitution

■ Melody contends that the statute of limitations in the Indiana Malpractice Act violates the privileges and immunities clause of the Indiana Constitution. While we recognize that previous constitutional challenges based on Indiana's equal privileges clause

---

**2.** Because we reach our decision solely on state constitutional grounds, we do not address Melody's fourteenth amendment argument.

have been overcome, Melody argues that precedent is not binding due to our supreme court's recent decision of *Collins v. Day,* 644 N.E.2d 72 (Ind.1994).[3] The precise issue raised by Melody is an issue of first impression in Indiana: Whether Indiana's occurrence-based statute of limitations for medical malpractice claims is constitutional under the *Collins v. Day* independent analysis of article I, § 23 of the Indiana Constitution. 644 N.E.2d 72.

Article I, § 23 was originally ratified in 1851 as part of the 1851 Indiana Constitution. Its purpose was essentially to avoid the creation of monopolies and to prohibit the State Legislature from granting exclusive privileges or immunities involving the State's participation in commercial enterprise. *Id.* at 77. The provision provides as follows:

> The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens.

Ind. Const. art. I, § 23.

In *Collins,* the supreme court abandoned the traditional Fourteenth Amendment scrutiny analysis and gave independent significance to Indiana's equal privileges clause. Prior to *Collins,* Indiana's equal privileges clause and the federal Constitution's privileges and immunities clause were considered coextensive and thought to protect identical rights. *See Haas v. South Bend Community Corp.,* 259 Ind. 515, 526, 289 N.E.2d 495, 501 (1972); *Johnson,* 404 N.E.2d at 600. The *Collins* court held that the requirements of article I, § 23 of the Indiana Constitution, are independent of and distinguishable from those imposed by the Fourteenth Amendment to the Constitution of the United States. *Collins,* 644 N.E.2d at 75.

Article I, § 23 of the Indiana Constitution imposes two requirements upon statutes that grant unequal privileges or immunities to differing classes of persons, which the *Collins* court articulated as follows:

> First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. Finally, in determining whether a statute complies with or violates Section 23, courts must exercise substantial deference to legislative discretion.

*Id.* at 80. As to the first component of the test, it has repeatedly been said that the basis for the classification "must inhere in the subject matter." *Id.* at 78 (citing *Railroad Comm'n v. Grand Trunk Western R. Co.,* 179 Ind. 255, 262, 100 N.E. 852, 854 (1913); *Hirth–Krause Co. v. Cohen,* 177 Ind. 1, 10, 97 N.E. 1, 5 (1912)). More pointedly, this means that

> where the legislature singles out one ... class of persons to receive a privilege or immunity not equally provided to others, such classification must be based upon distinctive, inherent characteristics which rationally distinguish the unequally treated class, and the disparate treatment accorded by the legislation must be reasonably related to such distinguishing characteristics.

*Id.* at 78–79.

The second prong to the § 23 analysis is that the disparate treatment must be applied equally and evenly to all those *within* the classification. As the supreme court stated in *Collins,* "any privileged classification must be open to any and all persons who share the inherent characteristics which distinguish

---

3. In *Collins,* a farm worker brought a worker's compensation claim after he broke his leg while working on the farm. His claim was denied because Indiana law exempts agricultural workers from the protections of the Act unless they opt in. Using Indiana's newly announced analysis, the court sustained the state law that excluded agricultural employers from the coverage of the Act. The court reasoned that the plaintiff failed to carry his burden 'to negative every rea- sonable basis for the classification.' 644 N.E.2d at 81. The distinctive nature of farm work, its attendant risks, typical level of training and experience, informality of the agricultural employment relationship and particular difficulties employers experience in passing along additional costs of worker's compensation insurance to consumers were some of the reasonable bases for the classification cited by the court. *Id.* at 81.

and justify the classification, with the special treatment accorded to any particular classification extended equally to all such persons." *Id.* at 79.

 In applying this two-part test, we must accord considerable deference to the manner in which the legislature has balanced the competing interests involved. *Id.* at 80. We begin with the presumption of validity and therefore the challenger labors under a heavy burden "to negative every conceivable basis which might have supported the classification." *Id.* The question of classification under § 23 is primarily a legislative question. *Id.* As our supreme court has often stated:

Legislative classification becomes a judicial question only where the lines drawn appear arbitrary or manifestly unreasonable. So long as the classification is based upon substantial distinctions with reference to the subject matter, we will not substitute our judgment for that of the legislature;

nor will we inquire into the legislative motives prompting such classification.

*Id.* (citing *Chaffin v. Nicosia,* 261 Ind. 698, 701, 310 N.E.2d 867, 869 (1974)).

The analytical framework employed in resolving claims brought pursuant to the Indiana Constitution's § 23 is still evolving.[4] Since *Collins,* we have had two medical malpractice statute of limitations cases before us in which the § 23 analysis was implicated. The plaintiffs in both cases argued that the tolling provision was constitutionally invalid because it distinguishes between minors who bring medical malpractice claims and are subject to the Act's disability tolling period and minors who bring ordinary tort claims and enjoy a much longer period. In both cases we remanded to the trial court to reconsider the constitutionality of § 27–12–7–1(b) in light of *Collins.* *See Ledbetter v. Hunter,* 652 N.E.2d 543 (Ind.Ct.App.1995); *Cundiff by Cundiff v. Daviess County Hosp.,*

4. No Indiana case to date has stricken down a statute based on the *Collins* analysis of article I, § 23. *See Indiana High School Athletic Ass'n v. Avant,* 650 N.E.2d 1164 (Ind.Ct.App.1995), *trans. denied* (court sustained Association's transfer rule whereby a student who transfers to a member school with a change of residence by the student's parents has immediate full varsity eligibility at the new school, and students who transfer without an accompanied change of residence by their parents are ineligible for varsity membership for 365 days following the transfer unless the student qualifies under one of thirteen listed exceptions. Specifically, it was held that the distinctions between the classifications were reasonably related to achieving the Association's purpose in deterring school jumping and recruitment and that the rule applied equally to all persons similarly situated); *American Legion Post No. 113 v. State,* 656 N.E.2d 1190 (Ind.Ct.App. 1995), *trans. denied* (court sustained state's anti-gambling statutes which authorize and exempt the State Lottery Commission from prosecution holding that there are inherent distinctions between the State Lottery Commission and every other organization and citizen which are reasonably related to the State's interest in maintaining the integrity and control over gambling activities within the State. The court further held that because the State Lottery Commission exclusively possesses the characteristics which justify its authorization and exemption, the second prong of the *Collins* test which requires the privilege to be afforded to all persons who share the inherent characteristics which justify the classification is also met); *Indiana High School Athletic Ass'n v. Reyes,* 659 N.E.2d 158 (Ind.Ct.App.1995), *transfer granted* (court sustained Association's rule that restricts participation in interscholastic

sports to eight semesters and permits commissioner to grant student extra year of eligibility to participate in interscholastic sports upon showing of undue hardship holding that students who have enrolled in more than eight semesters since initial enrollment in ninth grade (fifth year seniors) and those who have enrolled in eight or less semesters is a classification based upon distinctive, inherent characteristics and the unequal treatment of these classes is reasonably related to such distinguishing characteristics. We further held that the rule is uniform in its application and hence the second element of *Collins* is also met) (the supreme court granted transfer of this case and oral argument was heard in Fort Wayne on October 21, 1996; however, its opinion has not yet been issued. Because transfer has been granted, our opinion is considered vacated. *See* Ind.Appellate Rule 11(B)(3)); *Person v. State,* 661 N.E.2d 587 (Ind.Ct.App.1996), *trans. denied* (court sustained Indiana's statutory scheme which proscribes carrying a handgun without a license for adults and dangerous possession of a handgun for minors, even though minors found to have dangerously possessed a handgun can receive a five-day additional sentence. Court held that while the statutes appear to create an unequal burden on children, thereby granting a special privilege or immunity to adults, the special classification of children is reasonably related to the purpose of the legislation, which is to deter children from possessing handguns. Additionally, the court held that the statute applies uniformly to all those within the burdened class and sharing the inherent characteristic, those under 18 years old).

656 N.E.2d 298 (Ind.Ct.App.1995), *trans. denied.* Specifically, in *Ledbetter,* we stated that "[b]ecause our supreme court no longer treats the federal equal protection clause and the state privileges and immunities clause as coextensive, *Johnson* can no longer stand as authority that the Act meets the constitutional requirements of art. I, § 23 of the Indiana Constitution." 652 N.E.2d at 550.

It is the long-standing rule that we do not decide cases upon constitutional grounds when they can be decided upon other grounds. *Freeman v. State,* 658 N.E.2d 68, 72 (Ind.1995); *State v. Barnett,* 159 Ind. 432, 65 N.E. 515 (1902); *Hoover v. Wood,* 9 Ind. 286 (1857). In *Ledbetter* and *Cundiff,* we were not required to decide whether this new independent analysis would provide greater protection to victims of unfair classification schemes. However, the case before us leaves us no choice but to address the constitutional issue because the parties are aware of and have squarely framed the issue within the § 23 independent framework. Our supreme court has set forth the following standard of review for assessing constitutional challenges:

> Legislation under constitutional attack ... is clothed in a presumption of constitutionality. The burden to rebut this presumption is upon any challenger, and all reasonable doubts must be resolved in favor of an act's constitutionality. When a statute can be construed to support its constitutionality, such construction must be adopted.... Further, it is the challenger's burden to show that the alleged constitutional defects are clearly apparent.

*Matter of Tina T.,* 579 N.E.2d 48, 56–57 (Ind.1991).

Turning to the merits, it is clear that medical malpractice victims are treated differently than other tort victims. Ind.Code 34–1–2–2 provides that a cause of action for negligence shall be commenced within two years from the date the cause of action accrued. In *Wehling v. Citizens Nat. Bank,* 586 N.E.2d 840 (Ind.1992), our supreme court interpreted that statute and held:

> the cause of action of a tort claim accrues and the statute of limitations begins to run when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that an injury had been sustained as a result of the tortious act of another.

*Id.* at 843; *see also Barnes v. A.H. Robins Co., Inc.,* 476 N.E.2d 84 (Ind.1985) (when disease is caused by protracted exposure to a foreign substance, statute of limitations commences to run from date plaintiff knew or should have discovered injury and that it was caused by product or act of another). Accordingly, victims of other torts enjoy a discovery-based statute of limitations, whereas victims of medical malpractice have only two years from the date of occurrence of the malpractice whether they know they have been injured or not. The protections of § 23 are undoubtedly implicated here because the medical malpractice statute of limitations creates an unequal burden on victims of medical negligence, thereby implicitly granting a special privilege or immunity to victims of other torts. Victims of torts in general enjoy a "discovery-based" statute of limitations, whereas victims of medical malpractice are relegated to an "occurrence-based" statute, which evident from this case and countless cases in the past, can completely foreclose access to the courts.

Defining the unequally treated classes as the victims of medical negligence and the victims of other torts, we are compelled by precedent to hold that the disparate treatment is justified by reasonable bases for the classification. It has consistently been held that the classification is reasonably related to the goal of maintaining sufficient medical treatment and controlling malpractice insurance costs and is therefore not unreasonable.

The second-prong of the *Collins* test requires that any privileged classification be open to any and all persons who share the inherent characteristics which distinguish and justify the classification, and that the special treatment accorded to any particular classification be extended equally to all such persons. This second-prong, which focuses on the need for uniformity and equal availability of the treatment for all persons similarly situated, is not met by the current legislative scheme.

Under Ind.Code 27–12–7–1(b), all those similarly situated are not equally affected by the classification. Under the legislative scheme now in force, plaintiffs of medical negligence whose statute of limitations has expired prior to the time they become aware of or *discover* the malpractice, are treated unequally.

In so holding, we are mindful of the fact that the *Collins* court cautioned that conformity with § 23 does not require exact precision:

> A classification having some reasonable basis is not to be condemned merely because it is not framed with such mathematical nicety as to include all within the reason of the classification and to exclude all others. Exact exclusion and inclusion is impractical in legislation. It is almost impossible to provide for every exceptional and imaginary case, and a legislature ought not to be required to do so at the risk of having its legislation declared void, even though appropriate and proper as applied to the general subject upon which the law intended to operate.

*Collins,* 644 N.E.2d at 80. The *Collins* court cautioned against an approach which would require the legislature to anticipate every "exceptionable and imaginary case," that may cause inclusion or exclusion within a given class. This is not an "exceptional" or "imaginary" case; the statute as it stands completely forecloses the opportunity to be heard to potentially a very large percentage of those plaintiffs within the class. Thus, the treatment accorded by the legislation is not equally applied to all those persons who share the inherent characteristics that justify the classification.

**B. Open Courts/Complete Remedy**

**The Indiana Constitution**

■ In addition to arguing that the medical malpractice statute of limitations violates article I, § 23 of our state Constitution, Melody also argues that it violates article I, § 12 of the Indiana Constitution. A series of Texas cases declaring occurrence-based statutes of limitations unconstitutional under Texas's open courts provision have provided us with considerable guidance on this issue. Texas's statute provides that health care liability claims must be filed "within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or hospitalization for which the claim is made is completed." Tex.Rev.Civ. Stat. Ann. art. 4590i, § 10.01.

The Texas cases are of particular interest to us for two reasons. First, because they rely on the open courts provision of the Texas Constitution, which is strikingly similar to Indiana's article I, § 12;[5] and second, because their statute of limitations contains no *accrual* language thereby leaving no room for judicial construction.

Article 4590i, § 10.01 (formerly article 5.82 § 4), like Ind.Code 27–12–7–1(b), contains no *accrual* language, and thus imposes an absolute two-year statute of limitations regardless of when the injury was discovered.[6] In *Nelson v. Krusen,* 678 S.W.2d 918 (Tex.1984), the Supreme Court of Texas held that article 5.82, § 4 of the Insurance Code (which was replaced with essentially the same provision, now art. 4590i, § 10.01, when Texas adopted the Medical Liability and Insurance Improvement Act in 1975) violated the Texas Constitution's open courts provision which was construed to strip the legislature of the

---

**5.** The Texas provision provides that "[a]ll courts shall be open, and every person for an injury done him, in his lands, goods, person, or reputation, shall have remedy by due course of law." Tex. Const. art. I, § 13.

**6.** Article 5.82, § 4 of the Texas Insurance Code provided:

> Notwithstanding any other law, no claim ... for compensation for a medical treatment or hospitalization may be commenced unless the action is filed within two years of the breach or the tort complained of or from the date the

medical treatment that is the subject of the claim or the hospitalization for which the claim is made is completed.... Tex.Rev.Civ. Stat. Ann. article 5.82, section 4.

Article 4590i, § 10.01 provides that health care liability claims must be filed "within two years from the occurrence of the breach or tort or from the date the medical or health care treatment that is the subject of the claim or the hospitalization for which the claim is made is completed." Tex.Rev.Civ. Stat. Ann. art. 4590i, § 10.01.

power to make a remedy by due course of law contingent on an impossible condition. *Id.* at 921. Specifically, the court stated:

The limitation period of article 5.82, section 4, if applied as written, would require the [Plaintiffs] to do the impossible—to sue before they had any reason to know they should sue. Such a result is rightly described as 'shocking' and is so absurd and so unjust that it ought not be possible. (citations omitted). Deferring to the legislative imposition of such an unreasonable condition would amount to an abdication of our judicial duty to protect the rights guaranteed by the Texas Constitution, the source and limit of legislative as well as judicial power. This, we cannot do. We hold that article 5.82, section 4 of the Insurance Code is unconstitutional, under the open courts provision, to the extent it purports to cut off an injured person's right to sue before the person has a reasonable opportunity to discover the wrong and bring suit.

*Id.* at 923. Similarly, the Texas Court of Appeals in *Felan v. Ramos,* 857 S.W.2d 113 (Tex.Ct.App.1993), *reh'g denied,* and *Texas Medical Liability Trust v. Garza,* 918 S.W.2d 632 (Tex.Ct.App.1996), held § 10.01 unconstitutional under Texas's open courts provision. Each of these three Texas cases rely on the proposition that the open courts provision of the Texas Constitution is premised upon the principle that the legislature has no power to make a remedy by due course of law contingent upon an impossible condition. *Nelson,* 678 S.W.2d 918; *Felan,* 857 S.W.2d 113; *Garza,* 918 S.W.2d 632. We believe this rationale is equally applicable in Indiana.

■ In determining whether the Act's statute of limitations violates article I, § 12, we must (1) examine the language of the text in the context of the history surrounding its drafting and ratification; (2) examine the purpose and structure of our Constitution; and (3) examine case law interpreting the specific provision. *Indiana Gaming Com'n v. Moseley,* 643 N.E.2d 296, 298 (Ind.1994); *State Election Bd. v. Bayh,* 521 N.E.2d 1313, 1316 (Ind.1988).

A comparison of the differences between the open courts provision as it existed in the 1816 Constitution and the current version as adopted in Indiana's 1851 Constitution sheds considerable light on the intent of the drafters and on their view toward the sanctity of a complete tort remedy. The redrafting of the 1816 Bill of Rights was generally uneventful in that many of the provisions were transferred to the 1851 Constitution without change. However, the open courts provision was changed in several significant ways.

The open courts provision as it existed in the 1816 Constitution provided as follows:

That all courts shall be open, and every person, for an injury done him, in his lands, goods, person, or reputation, shall have remedy by the due course of law; and right and justice administered without denial or delay.

Ind. Const. art. I, § 11 (1816). The open courts provision as amended during the 1850–51 Constitutional Convention and as it presently exists provides as follows:

All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law. Justice shall be administered freely, and without purchase; completely and without denial; speedily, and without delay.

Ind. Const. art. I, § 12.

■ Looking at the text of the two provisions, we note two changes. First, the drafters of the 1851 Constitution saw fit to separate what is now the first full sentence of § 12 with a semicolon. Hence, leaving us the two independent clauses, "[a]ll courts shall be open" and "every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." One way of discerning legislative intent is to compare the language of the present act with that of its forerunner. *Gingerich v. State,* 228 Ind. 440, 93 N.E.2d 180 (1950). The rules applicable to statutory construction are equally applicable to constitutional construction. *See State v. Nixon,* 270 Ind. 192, 384 N.E.2d 152, 156 (1979). We presume that "the Constitution was carefully made, and that every word in it was carefully chosen to express the intention of the constitutional convention ..." *Allen v. Van Buren Tp. of*

*Madison County,* 243 Ind. 665, 184 N.E.2d 25, 29 (Ind.1962). The intent of the Framers of the 1851 Constitution could not have been other than to recognize two independent rights: the right of access to the courts and the right to a complete tort remedy.

The second change made by the Framers of the 1851 Constitution further supports this construction. The second change was to add what is now the second full sentence of article I, § 12; "Justice shall be administered freely, and without purchase; *completely,* and without denial; speedily, and without delay." (emphasis added). The last sentence of the 1816 version of article I, § 11 simply provided that "right and justice be administered without denial and delay." These changes impress upon us the importance the drafters of our Constitution placed upon the sanctity of the right to a *complete* tort remedy.

The next step in discerning the intent of our Constitution's Framers is to look to the purpose and structure of our Constitution. *Moseley,* 643 N.E.2d at 298. A thoughtful look at the express decisions and general climate of the 1850–51 Constitutional Convention demonstrates that the Framers did not wish to confer upon the General Assembly any sort of broad power, and especially not broad powers to abrogate the common law right to a remedy for tortious injuries. Three sets of decisions made by the Framers of the 1850–51 Constitutional Convention re-

veal their distrust of the General Assembly and general "populist" attitudes.

First, three proposals were offered during the 1850–51 Constitutional Convention to either alter the common law or abolish it outright or to confer the power upon the General Assembly to do the same. Each of these proposals was rejected.[7] More significantly perhaps is the fact that these proposals were even made, because it implies that the delegates believed that the Constitution of 1816 preserved the common law and that the General Assembly lacked the power to alter or abolish the common law without express constitutional authority. Second, the Framers approved three narrow changes in the common law during the 1850–51 Convention.[8] Hence, we know that the Framers believed that constitutional reformation was required to make even the slightest change to common law rights. We also know that the Framers knew how to expressly abrogate provisions of the common law when they wished to do so.

Despite the many opportunities to alter the common law during the 1850–51 Convention, the Framers did so sparingly. Of the three limited instances where the Framers deemed change to the common law necessary, two involved narrow criminal issues, and the third made the civil justice system more accessible to plaintiffs. Also of some significance is the fact that article I, § 5 of the 1816 Constitution, which established a

---

7. On October 17, 1850, Delegate Daniel Read introduced a proposal to insert a provision in the Bill of Rights to permit the General Assembly to "alter, amend, or repeal, any law of the State." Journal of The Convention of The People of The State of Indiana To Amend The Constitution ("Convention Journal") 90 (1851). A second proposal was introduced on November 21, 1850, by Delegate George Tague to "abolish the common law of England" outright. Convention Journal at 276. Each of these proposals were rejected. The third proposal was introduced by three delegates of the Committee on the Practice of Law and Law Reform, whose task was to reform and modernize the State's laws. This third proposal, among other things, would have authorized the General Assembly to codify the statutory laws of the State. Convention Journal at 214–15. Three dissenting members of the same committee submitted a counterproposal which would authorize the General Assembly to codify not only the "General Statute Law" as recommended by the majority proposal, but "the

whole body of the laws of the State." On January 24, 1851, by a margin of 97 to 35 the Framers adopted the majority proposal, authorizing the General Assembly to codify only the statutory laws of the State, and not the common law. Convention Journal at 775.

8. There are only three instances where the Constitution of 1816 or the Constitution of 1851 provided for the modification or abolition of common law rules or rights. The first is found at article I, § 10 of the 1851 Constitution (transferred from the 1816 Constitution), which reversed the common law rule that truth was no defense to criminal libel. The second instance is found at article VIII, § 17, which authorizes the General Assembly to abolish the grand jury system. Third, article VII, § 20 of the 1851 Constitution (since repealed), provided for the formation of a committee to, in effect, simplify the rules of practice thereby making civil litigation more accessible to people.

$20 amount-in-controversy minimum, was not retained in the 1851 Constitution. *See* Convention Journal at 964–65.

Finally, at the same time that the Framers of the 1851 Constitution were taking express action to preserve the common law, confer minimal authority upon the General Assembly to alter or abolish the common law, aid litigants in gaining access to the courts and the jury trial system, they seemed to be taking pains to place new restrictions upon the General Assembly. For example, the Framers added article I, § 23 to the Bill of Rights, forbidding the legislature from granting special privileges and immunities to any citizen or class of citizens. The Framers again expressed their disdain for special laws by enacting article IV, § 22, a provision barring the enactment of "local or special" laws.

■ These facts taken together convince us that the Framers neither intended nor did they confer upon the General Assembly the power to modify or abolish the common law. They especially did not intend to authorize the General Assembly to abrogate the common law right to a complete tort remedy, a right which was singled out for special protection at the 1850–51 Convention.

Under the common law, a physician faced potential liability for malpractice. *Ross v. Schubert,* 180 Ind.App. 402, 388 N.E.2d 623, 627 (1979), *trans. denied.* The relationship between a health care provider and a patient exists from a common law duty, and as such the statutory procedures for bringing a medical malpractice action are in derogation of the common law. *Comer v. Gohil,* 664 N.E.2d 389, 391 (Ind.Ct.App.1996).

■ When analyzing state constitutional issues, Indiana courts have the responsibility of independent constitutional analysis. *Taylor v. State,* 639 N.E.2d 1052, 1053 (Ind.Ct. App.1994) (citing *Cooper v. State,* 540 N.E.2d 1216, 1217 (Ind.1989)). This is so because the protections provided by the Indiana Constitution may be more extensive than those provided by its federal constitutional counterpart. *See generally* Randall T. Shepard, *Second Wind for the Indiana Bill of Rights,* 22 Ind.L.Rev. 575 (1989); Patrick Baude, *Is There Independent Life in the Indiana Constitution?,* 62 Indiana Law Journal 263 (1986–87); Patrick Baude, *Has the Indiana Constitution Found Its Epic,* 69 Indiana Law Journal 849 (Summer 1994). When employing this independent analysis, we conclude that the drafters of our Constitution intended article I, § 12 to guarantee not only the right to open courts, but also the right to a complete tort remedy. Hence, the limitation provision contained at Ind.Code 27–12–7–1(b) is an unconstitutional abrogation of the right to a complete tort remedy as guaranteed by article I, § 12 of the Indiana Constitution.

Although the Act has survived a number of constitutional challenges, including challenges based on article I, § 12, we do not believe that the doctrine of *stare decisis* requires us to merely "sleepwalk through the law." *See Moreno,* 787 S.W.2d at 364 (Doggett, J., dissenting). Our supreme court recognized that the doctrine of *stare decisis* is only worth its weight in reason when it abolished the doctrine of charitable immunity in *Harris v. Young Women's Christian Ass'n of Terre Haute:*

> Stare decisis channels the law. It erects lighthouses and flies the signals of safety. The ships of jurisprudence must follow that well-defined channel which, over the years, has been proved to be secure and trustworthy. But it would not comport with wisdom to insist that, should shoals rise in a heretofore safe course and rocks emerge to encumber the passage, the ship should nonetheless pursue the original course, merely because it presented no hazard in the past. The principle of stare decisis does not demand that we follow precedents which shipwreck justice.

*Harris,* 250 Ind. 491, 237 N.E.2d 242, 244 (Ind.1968) (quoting *Flagiello v. Pennsylvania Hospital,* 417 Pa. 486, 208 A.2d 193 (1965)). Since the Indiana courts last visited this issue, substantial scholarly constitutional analysis has emerged which gives us added perspective, and we therefore do not consider ourselves constrained by the doctrine of *stare decisis.*

Indeed, over a decade ago, a panel of this court considered the large number of plaintiffs left without a remedy under the occur-

rence-based statute of limitations and said, "[w]e have not though, ruled out the possibility of deciding in a future case that this occurrence rule must be applied as though it was a discovery rule due to the questionable constitutionality of the occurrence rule." *Alwood v. Davis,* 411 N.E.2d 759, 761 (Ind.Ct. App.1980).

A discovery-based statute of limitations should apply equally to medical malpractice claimants in this State. As one dissenting Justice from the New York Court of Appeals said in commenting on an occurrence-based statute: "[i]t is sought here to declare the bread stale before it is baked." *Fleishman v. Eli Lilly & Co.,* 96 A.D.2d 825, 465 N.Y.S.2d 735, 737 (N.Y.A.D.1983) (Gibson, J., Concurring and Dissenting). We suspect that the Framers of our Constitution would have agreed with Justice Jerome Frank's Alice–in–Wonderland notion on the absurdity of an occurrence-based statute of limitations:

> Except in topsy-turvy land, you can't die before you are conceived, or be divorced before ever you marry, or harvest a crop never planted, or burn down a house never built, or miss a train running on a nonexistent railroad. For substantially similar reasons, it has always heretofore been accepted, as a sort of legal 'axiom,' that a statute of limitations does not begin to run against a cause of action before that cause of action exists, i.e., before a judicial remedy is available to the plaintiff.

*Dincher v. Marlin Firearms Co.,* 198 F.2d 821, 823 (2nd Cir.1952) (Frank, J., dissenting) (quoted approvingly in *Patterson v. Her Majesty Industries, Inc.,* 450 F.Supp. 425, 428 (E.D.Pa.1978)). Today we hold that Ind. Code 27–12–7–1(b) violates article I, § 23 and article I, § 12 of the Indiana Constitution and we declare it unconstitutional. Therefore, Melody's cause of action is not time-barred.

To be sure, adoption of the discovery rule will result in extended exposure to liability by health care providers. However, outer-limit statutes with foreign object and fraudulent concealment exceptions appear to provide a good compromise position for plaintiffs, health care providers and insurers. *See e.g.* Colorado's statutory scheme, Colo. Rev

Stat. § 13–80–102.5; § 13–80–108(1); *Mastro, M.D. v. Brodie,* 682 P.2d 1162 (Colo. 1984) (knowing concealment and foreign object exceptions applicable to three year outer-limit statute). In any event, these concerns are better left to the legislature.

II. Doctrine of Fraudulent Concealment

■ Melody also contends that the trial court erred by failing to find genuine issues of material facts concerning whether the statute of limitations was tolled by the doctrine of fraudulent concealment. Although we declare the statute unconstitutional, we will address this issue because it may become applicable in the future under an outer-limit statute.

■ The doctrine of fraudulent concealment operates to estop a defendant from asserting a statute of limitations defense when that person has concealed material facts from the plaintiff by deception or a violation of duty. This equitable doctrine was adopted in Indiana in the case of *Guy v. Schuldt,* 236 Ind. 101, 138 N.E.2d 891 (Ind. 1956), as a method of ameliorating the harshness of the stringent occurrence-based statute. The doctrine was more recently described in *Hospital Corp. of America v. Hiland,* 547 N.E.2d 869 (Ind.Ct.App.1989), *reh'g denied, trans. granted and opinion adopted by Cacdac,* 561 N.E.2d 758 as follows:

> The doctrine of fraudulent concealment operates to estop a defendant from asserting a statute of limitations defense when that person, by deception or a violation of a duty, has concealed material facts from the plaintiff thereby preventing discovery of a wrong. Thus, equitable estoppel can arise either from active efforts to conceal the malpractice or from failure to disclose material information when a fiduciary or confidential relationship exists between the physician and patient. The physician's failure to disclose that which he knows, or in the exercise of reasonable care should have known, constitutes constructive fraud. This constructive fraud terminates at the conclusion of the physician-patient relationship at which time the statute of limitations begins to run. The statute will also commence to run after a patient learns of

the malpractice, or discovers information which would lead to the discovery of the malpractice if the patient exercises reasonable diligence. Fraudulent concealment thus tolls the running of the statute of limitations until either the physician-patient relationship is terminated or the patient discovers the malpractice or learns information which in the exercise of due diligence would lead to the discovery of the malpractice.

*Id.* at 873. Melody's argument focuses on the active branch of the doctrine of fraudulent concealment. Our supreme court has recently pointed out that under active fraudulent concealment, the period of estoppel is not affected by the date of termination of the physician-patient relationship, but continues for a reasonable time after discovery of the malpractice itself or of information which would lead to discovery of the malpractice. *Hughes*, 659 N.E.2d at 519.

In Melody's opposition to Dr. Richey's motion for summary judgment, she alleges that Dr. Richey's active misconduct amounts to fraudulent concealment which operates to toll the statute of limitations. Within the designated evidence in opposition to summary judgment, Melody points to several facts from which she contends a jury could reasonably infer that Dr. Richey knew that he could have failed to diagnose her breast cancer. Specifically, she points to the following facts: Dr. Richey knew that an excisional biopsy was indicated for Melody at the time he performed the needle aspiration (R. 147); Dr. Richey knew that a needle aspiration is not as diagnostic as an excisional biopsy (R. 127); Dr. Richey knew that he may not have actually collected a sample from Melody's breast mass (R. 165, 168, 189); Dr. Richey knew that the sample he collected may have been from tissue surrounding the breast mass (R. 168); and Dr. Richey knew that if the tissue came from the mass surrounding a malignant mass, and not from the mass itself, the pathology report would show benign cells and might miss an existing cancer (R. 120). Despite this information known to Dr. Richey, he represented to Melody that he had collected a sample from the breast mass. In sum, Melody contends that

Dr. Richey's affirmative misrepresentations misled [her] into believing that a specimen of the lump in her breast was biopsied and sent to pathology. Dr. Richey's conduct prevented [her] from discovering the truth—that Dr. Richey probably did not take a sample from the lump, and therefore, the lump was never actually biopsied. Melody discovered she had breast cancer more than three years after Dr. Richey improperly performed a needle aspiration which resulted in a falsely negative pathology report. Dr. Richey should not be permitted to take advantage of his own deceit and concealment by asserting the statute of limitations as a defense.

(R. 322–23).

This case is similar to *Hughes*, 659 N.E.2d 516, in that the plaintiffs' allegations of malpractice are based on failure to diagnose; however, the cases are factually distinguishable. The *Hughes* court held that the defendant-physician's conduct did not rise to the level of active fraudulent concealment because "[the plaintiff] present[ed] no evidence from which a finder of fact might reasonably infer that Dr. Hughes had actual knowledge of the X-ray findings, that he intentionally concealed the results from her, or that his statement that she was 'okay' was calculated to prevent inquiry or to mislead her." *Id.* at 522. Representing to a patient in the vaguest of terms that she is "okay" following a surgery for an unrelated matter is certainly different from the representations Dr. Richey made to Melody. Dr. Richey virtually assured Melody that she had nothing to worry about, that pathology results indicated no cancerous cells, that she probably just had fibrocystic breast disease. Additionally, he led her to believe that the excisional biopsy was performed on the mass itself, when he knew that he had possibly only drawn fluid from the surrounding breast tissue.

The *Hughes* court stated that in order to qualify as affirmative acts of concealment

... the actions must be calculated to mislead and hinder a plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation. 'There must be some trick or

contrivance intended by the defrauder to exclude suspicion and prevent inquiry.'

*Hughes,* 659 N.E.2d at 521 (citing *Keesling v. Baker & Daniels,* 571 N.E.2d 562, 565 (Ind. Ct.App.1991), *trans. denied* ). The *Hughes* court further clarified the required culpability as follows:

> When the special medical malpractice statute of limitations is being asserted, and the provider has intentionally withheld or concealed from a patient important medical information of which the physician has actual knowledge, a fact-finder may reasonably infer a health care provider's intent to hinder discovery, prevent inquiry, and elude investigation. Such conduct by a physician would satisfy the active concealment branch of the fraudulent concealment doctrine.

*Id.*

By Dr. Richey's own admissions, he was unsure whether the aspirate from the needle biopsy came from the solid mass or the surrounding tissue and he knew that an excisional biopsy would be more diagnostic. Yet, he failed to convey this information to Melody, and in fact, told her that he obtained fluid from the mass. Additionally, viewing the evidence in the light most favorable to Melody, Dr. Richey did not advise her regarding the need for further surgical consultation. Melody has presented evidence that Dr. Richey withheld important medical information from her. From this evidence, a jury could infer Dr. Richey's intent to hinder discovery of the malpractice. Therefore, based on the undisputed evidence, there are genuine issues of material fact regarding the doctrine of active fraudulent concealment.

## CONCLUSION

Based on the foregoing, we find that there are genuine issues of material fact regarding whether the statute of limitations was tolled by the doctrine of active fraudulent concealment. We further find that the statute of limitations as contained in Indiana's Medical Malpractice Act violates article I, § 23 and article I, § 12 of the Indiana Constitution. We therefore reverse and remand for further proceedings consistent with this opinion.

CHEZEM, J., concurs.

DARDEN, J., dissents with separate opinion.

DARDEN, Judge, dissenting.

I respectfully dissent. Although I agree that the statute of limitations contained in Indiana's Medical Malpractice Act is brutal in its application, I am unable to agree that the statute of limitations is unconstitutional.

When construing a statute, we must give effect to the intention of our legislature. *Bunker v. National Gypsum Co.,* 441 N.E.2d 8, 11 (Ind.1982). This is because the Indiana Constitution explicitly vests in the General Assembly the exclusive power to legislate. Ind. Const. art. 4, § 1. Our supreme court has "repeatedly warned that the judiciary must not usurp the constitutional function of the legislature." *Id.* Therefore, appellate courts must not substitute judicial judgment for legislative judgment in legislative matters that neither affect fundamental rights nor proceed along suspect lines. *Id.*

Further, an act of the legislature must be afforded a presumption of constitutionality. *Id.* Accordingly, the burden to rebut this presumption is upon the challenger and all reasonable doubts must be resolved in favor of an act's constitutionality. *Id.* Although appellate courts may review the power of the legislature to act, the courts must not evaluate the policies adopted by the legislature. *Id.* at 12.

Legislative statutes of limitations carry a general presumption of constitutionality. *Id.* A statute of limitations will comport with the constitutional demand for due process so long as it provides a reasonable time for the bringing of an action. *Id.* The legislature has the sole duty and responsibility to determine what constitutes a reasonable time for the bringing of an action unless the period allowed is so manifestly insufficient that it represents a denial of justice. *Id.*

Here, the majority has contravened settled case law in finding the statute of limitations in the Medical Malpractice Act to be unconstitutional. The statute of limitations has survived numerous attacks on its constitutionality. *See e.g., Rohrabaugh v. Wagoner,*

274 Ind. 661, 413 N.E.2d 891 (1980); *Johnson v. St. Vincent Hosp.*, 273 Ind. 374, 404 N.E.2d 585 (Ind.1980); *Nahmias v. Trustees of Indiana University*, 444 N.E.2d 1204 (Ind. Ct.App.1983); *Carmichael v. Silbert*, 422 N.E.2d 1330 (Ind.Ct.App.1981).

In *Rohrabaugh*, our supreme court noted that the Medical Malpractice Act was enacted as a legislative response to the reduction of health care services available to the public. *Rohrabaugh*, at 794. This health care reduction was the result of health care providers making the decision to stop providing their services. *Id.* It was the legislature's perception that health care providers were making this decision because of increased malpractice claims and the difficulty in obtaining malpractice insurance. *Id.* One of the methods that the legislature used to remedy this problem involved limiting patient remedies against health care providers, in part by restricting the time in which a plaintiff has to bring suit. The legislature required medical malpractice plaintiffs to bring their cause of action within two years of the time the act, omission, or neglect occurred.

In *Havens v. Ritchey*, 582 N.E.2d 792, 795 (Ind.1991), our supreme court noted that "Indiana courts have previously acknowledged the inherent harshness of the occurrence rule on certain plaintiffs, but have found the rule to be reasonable in light of other policies intended to be furthered by the rule." If two years is no longer a reasonable time for the bringing of a medical malpractice action, *see Bunker, supra*, the legislature, not the court of appeals, needs to revisit the rule.

For the foregoing reasons, I would affirm the trial court's grant of summary judgment in favor of Dr. Richey.