Charles E. HUGHES, III, M.D.,
Defendant–Appellant,

v.

Angela K. GLAESE, Plaintiff–Appellee.

No. 49S02–9512–CV–1379.

Supreme Court of Indiana.

Dec. 28, 1995.

Kevin Charles Murray, Locke Reynolds Boyd & Weisell, Indianapolis, for appellant.

Marshall S. Hanley, Mitchell Hurst Jacobs & Dick, Indianapolis, for appellee.

On Petition To Transfer

DICKSON, Justice.

We are asked to determine whether a physician's conduct constituted active fraudulent concealment so as to estop the physician from asserting the medical malpractice statute of limitations. In this interlocutory appeal, the Court of Appeals reversed the trial court's denial of the defendant physician's motion for summary judgment. *Hughes v. Glaese* (1994), Ind.App., 637 N.E.2d 822. Alleging inconsistencies between this decision and other case law on the question, the plaintiff seeks transfer. Transfer is granted.

The relevant facts were summarized by the Court of Appeals as follows:

> The facts in the light most favorable to the nonmovant Glaese reveal that Glaese suffered an abdominal defect following a Caesarean delivery. She was referred to Dr. Hughes, a reconstructive plastic surgeon, for abdominal repair surgery. As part of the routine pre-operative work-up, Dr. Hughes ordered a chest X-ray. The X-ray revealed a rounded density. The radiologist's report of the X-ray stated, "... this may represent an enlarged lymph node, but other mediastinal mass lesion cannot be excluded. A lateral view would

be helpful to assist in localization of the density." Dr. Hughes performed the abdominal repair surgery and briefly followed up on Glaese's recovery. On November 14, 1989, Dr. Hughes released Glaese to her family physician and assured her that she was "okay." Thus, the physician-patient relationship ended November 14, 1989.

Almost three years later, on November 4, 1992, Glaese was diagnosed with Hodgkin's Disease. Soon thereafter, Glaese learned that Dr. Hughes had affirmatively misrepresented her condition by failing to disclose to her the results of her 1989 chest X-ray and by telling her that she was "okay." Glaese filed her proposed complaint against Dr. Hughes with the Indiana Department of Insurance less than three months later. Glaese alleges that Dr. Hughes committed malpractice by "simply ignoring, overlooking and disregarding" the chest X-ray, failing to communicate the results of the X-ray, and affirmatively misrepresenting that she was "okay." Glaese asserts Dr. Hughes' malpractice caused her to lose valuable time in her battle against Hodgkin's Disease.

*Hughes*, 637 N.E.2d at 824.

The defendant initiated a summary judgment proceeding in the trial court pursuant to Indiana Code § 27–12–11–1, asserting that the proposed claim was not filed within the medical malpractice statute of limitations, which provides in part:

> A claim, whether in contract or tort, may not be brought against a health care provider based upon professional services or health care that was provided or that should have been provided unless the claim is filed within two (2) years after the date of the alleged act, omission, or neglect, except that a minor less than six (6) years of age has until the minor's eighth birthday to file.

Ind.Code § 27–12–7–1(b) (formerly Ind.Code § 16–9.5–3–1(a)). In denying summary judgment, the trial court noted evidence that the plaintiff did not learn of the potential mal-

practice until October or November of 1992 and filed her proposed complaint on January 27, 1993. It found that there existed a genuine issue of material fact regarding whether the defendant made affirmative representations about the plaintiff's condition and that such representations "could trigger the doctrine of fraudulent concealment which would then act as a bar to defendant's statute of limitations defense." Record at 81.

In his appeal of the trial court's denial of summary judgment, Dr. Hughes expressly "recognizes the existence of conflicting opinions from the Court of Appeals over the last decade" and seeks "clarification and the adoption of a reasonable and practical rule of law." Brief of Appellant at 9. He contends that the doctrine of active fraudulent concealment applies only where intentional misconduct affirmatively conceals information from a patient and that the doctrine is not available where the alleged concealment results from mere negligence. The defendant argues that the issue is whether his conduct constitutes active fraudulent concealment. He contends that he did not actively conceal the alleged malpractice and that, even if the Court finds constructive concealment, the claim is time-barred because Ms. Glaese unreasonably delayed by not filing suit until 39 months after the termination of the physician-patient relationship. The plaintiff contends that a physician's active concealment of a material fact, preventing the discovery of malpractice, constitutes active fraudulent concealment and thus tolls the statute of limitations until the patient discovers or should have discovered the malpractice. Ms. Glaese contends that Dr. Hughes's conduct, withholding her X-ray results and telling her she was "okay" when the X-ray report showed otherwise, constitutes active fraudulent concealment, thus estopping him from asserting the limitations statute, and that she acted reasonably by instituting her claim within three months after she discovered the alleged malpractice.[1]

■ This Court has on prior occasions noted the brutal nature of the medical mal-

---

1. We note, as did the Court of Appeals, that Ms. Glaese "essentially concedes that her claim cannot survive under the theories of constructive fraudulent concealment or continuing wrong," but instead relies upon the claim of active fraudulent concealment. *Hughes*, 637 N.E.2d at 825.

practice statute of limitations. *See, e.g., Havens v. Ritchey* (1991), Ind., 582 N.E.2d 792, 795 ("inherent harshness of the occurrence rule on certain plaintiffs"); *Rohrabaugh v. Wagoner* (1980), Ind., 413 N.E.2d 891, 895 ("no doubt that this measure is a stern one and will have harsh application in individual cases"). This effect has been somewhat ameliorated by judicial application of the equitable doctrine of fraudulent concealment.

The doctrine of fraudulent concealment operates to estop a defendant from asserting a statute of limitations defense when that person, by deception or a violation of a duty, has concealed material facts from the plaintiff thereby preventing discovery of a wrong. Thus, equitable estoppel can arise either from active efforts to conceal the malpractice or from failure to disclose material information when a fiduciary or confidential relationship exists between the physician and patient. The physician's failure to disclose that which he knows, or in the exercise of reasonable care should have known, constitutes constructive fraud.

*Hospital Corp. v. Hiland* (1989), Ind.App., 547 N.E.2d 869, 873 (citations omitted), *adopted by Cacdac v. Hiland* (1990), Ind., 561 N.E.2d 758.

The principal significance of the distinction between the two branches of the fraudulent concealment doctrine, active and passive, lies in the different points in time at which plaintiffs may commence their malpractice actions. When the concealment is constructive—the failure of a physician to disclose material information to a patient—such duty to disclose ceases at the termination of the physician-patient relationship, and "estoppel will be denied if the plaintiff fails to exercise due diligence in filing his claim after the equitable grounds cease to be operational as a valid basis for inducing the plaintiff's delay." *Hospital Corp.*, 547 N.E.2d at 873. In contrast, when the concealment is active, the period of estoppel is not affected by the date of termination of the relationship but continues for a reasonable time after "the plaintiff discovers the alleged

malpractice or discovers information which in the exercise of reasonable diligence would lead to discovery of the malpractice." *Id.* at 874–75. Regardless whether the fraudulent concealment is active or constructive, a plaintiff must institute an action within a reasonable time "after a patient learns of the malpractice, or discovers information which would lead to the discovery of malpractice if the patient exercises reasonable diligence." *Id.* at 873. Thus, when the concealment is constructive, the plaintiff's duty of diligence is triggered by the termination of the physician-patient relationship or by the actual discovery or reasonable opportunity to discover the malpractice, whichever occurs first; but when the concealment is active, the duty of diligence does not commence until such actual or reasonably possible discovery.

The facts of the present case bear a strong resemblance to those of *Martin v. Rinck* (1986), Ind.App., 501 N.E.2d 1086. In that case, the patient was hospitalized and received a routine chest X-ray, the radiologist's report of which identified a lung tissue mass and advised further evaluation. The treating physician did not disclose this information to the patient. To the contrary, the doctor's office records indicated the patient was "okay" and had progressed properly from surgery. Following the patient's death from cancer, his estate initiated a medical malpractice action. The defendant moved for summary judgment, asserting the Medical Malpractice Act's statute of limitations.[2] The trial court granted summary judgment, but a unanimous panel of the Court of Appeals reversed and held that the plaintiff was entitled to trial on her claim of fraudulent concealment, noting, "Here, we have an affirmative misrepresentation by [the doctor] wherein he indicated [the patient] was doing 'okay' and progressing well from the surgery." *Martin,* 501 N.E.2d at 1089–90.

In contrast, the Court of Appeals in the present case stated that "an affirmative misrepresentation that the patient is 'okay' does not necessarily constitute an active fraudulent concealment." *Hughes,* 637 N.E.2d at

2. In *Martin,* the chest X-ray report was dated January 28, 1977; the physician-patient relationship ended August 5, 1977; the report was discovered October 9, 1981; and the proposed complaint was filed January 18, 1982.

825. In so doing, it distinguished affirmative misrepresentations made in efforts to conceal misconduct from those affirmative misrepresentations merely resulting from mistaken diagnoses. *Id.*

Several fraudulent concealment cases have addressed the import of particular representations by physicians to patients. *Wojcik v. Almase* (1983), Ind.App., 451 N.E.2d 336 (hospital dismissal alleged to be representation of wellness and of no need for further treatment); *Carrow v. Streeter* (1980), Ind. App., 410 N.E.2d 1369 (doctor said plaintiff's pain "could take a couple of years to go away"); *Adams v. Luros* (1980), Ind.App., 406 N.E.2d 1199 (doctor said patient "had to live with the problem until it got better or worse"). In each of these cases, however, the question was not whether the representations constituted active concealment. Rather, these were constructive concealment cases in which at issue were the date of termination of the relationship, the subsequent duration of the patient's reasonable reliance on the physician's judgment, and the patient's diligence in commencing the action. Accordingly, these opinions do not illuminate the elements that characterize active concealment.

To resolve the inconsistency between *Martin* and *Hughes,* we look to the reasoning originally utilized in recognizing the equitable doctrine of fraudulent concealment to supersede a medical malpractice statute of limitations. The foundational precedent is *Guy v. Schuldt* (1956), 236 Ind. 101, 138 N.E.2d 891, in which we stated:

> It is established by the overwhelming weight of authority that equity will step in with its doctrine of estoppel to prevent an inequitable resort to the statute of limitations by one who has intentionally and fraudulently concealed a cause of action from a party for such length of time that the statute has run. Before the doctrine of estoppel may be used to bar the defendant's use of the statute of limitations, the fraud must be of such character as to prevent inquiry, or to elude investigation, or to mislead the party who claims the cause of action.

*Id.* at 107, 138 N.E.2d at 894. The basis for distinguishing between active and constructive fraudulent concealment in medical malpractice cases lies in the nature of the physician's conduct.

> Usually, there must be some active effort on the part of one to be guilty of concealment but where a fiduciary or confidential relationship exists, such as physician-patient, there exists a duty to disclose material information between the parties and a failure to do so results in concealment.

*Id.* at 109, 138 N.E.2d at 895. A plaintiff will not be time-barred before he or she "first learns of the wrong ... where the fraud is of a continuous character and active concealment continues to exist." *Id.* However, where the concealment results from a breach of the duty to inform "by reason of a confidential relationship," concealment ceases to exist when the relationship is terminated. *Id.* A defendant's culpability as to the concealment is thus the primary factor in determining how long the estoppel continues after the cessation of the physician-patient relationship.

> We feel our interpretation of the statute of limitations in this case should be in accordance with the principles of equity.... Principles of equity always intervene in such situations to prevent a party from gaining an advantage by fraudulently concealing an injury wrongfully done another who has not become aware of it until later.

*Guy,* 236 Ind. at 111–12, 138 N.E.2d at 895–96.

This emphasis on culpability is also evident in *van Bronckhorst v. Taube* (1976), 168 Ind. App. 132, 341 N.E.2d 791. Because the complaint there alleged active misrepresentations intended to deceive the plaintiff, the court found it unnecessary either to determine whether the termination of the relationship affected the duration of the estoppel or to distinguish "between failure to disclose, on the one hand, and affirmative or active concealing effort, on the other." *Id.* at 143, 341 N.E.2d at 798. In its reasoning, however, the court observed that it was the "affirmative or active concealing effort," in contrast to the constructive concealment resulting

from communication omissions during the physician-patient relationship, that characterized active fraudulent concealment. *Id.*

 In a recent legal malpractice case in which the statute of limitations was challenged by a claim of fraudulent concealment under the doctrine's "active efforts to conceal" branch, the Court of Appeals articulated this culpability as follows:

> To be affirmative acts of concealment, the actions must be calculated to mislead and hinder a plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation. 'There must be some trick or contrivance intended by the defrauder to exclude suspicion and prevent inquiry.'

*Keesling v. Baker & Daniels* (1991), Ind. App., 571 N.E.2d 562, 565 (citations omitted). When the special medical malpractice statute of limitations is being asserted, and the provider has intentionally withheld or concealed from a patient important medical information of which the physician has actual knowledge, a fact-finder may reasonably infer a health care provider's intent to hinder discovery, prevent inquiry, and elude investigation. Such conduct by a physician would satisfy the active concealment branch of the fraudulent concealment doctrine.

 In the present case, Dr. Hughes emphasizes the absence of evidence showing that he had actual knowledge that the plaintiff had chest disease or that he deceptively or intentionally kept information from the patient. He argues that active fraudulent concealment requires intentional misconduct, not negligence. Ms. Glaese urges that the distinction should not be based upon the physician's intent or purpose, but rather upon whether the misrepresentation is of such a nature as to prevent inquiry or to mislead.

To accept the plaintiff's view would essentially transform all cases of constructive concealment (a plaintiff's duty of diligence commencing generally upon termination of the physician-patient relationship) into cases of active concealment (the duty of diligence not commencing until actual or reasonably possible discovery of malpractice). Virtually all information undisclosed by a physician, whether resulting from a negligent breach of duty to inform or from an intentional, active misrepresentation, would to some degree be likely to prevent inquiry or to mislead and would therefore satisfy the plaintiff's proposed standard. Furthermore, the likelihood that a particular misrepresentation will prevent inquiry or mislead is not a reliable measure for determining the length of time during which a physician should be estopped from using the statutory limitations defense. This likelihood may vary because of circumstances not related to the degree of culpability attributable to the physician's concealment. In contrast, by distinguishing the two branches of fraudulent concealment on the basis of whether the physician's concealment was negligent or purposeful, courts can make more appropriate and just determinations as to when defendant physicians should be prevented from asserting the limitations defense. We decline to abolish the distinction between constructive and active fraudulent concealment.

In this appeal from the denial of summary judgment, we face the same issues that the trial court did and utilize the same analysis. *See Oelling v. Rao* (1992), Ind., 593 N.E.2d 189, 190. Summary judgment should be entered "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind.Trial Rule 56(C).

In the brief in support of his motion for summary judgment, Dr. Hughes clearly designated the statute of limitations to be an issue on which he claimed to be entitled to judgment as a matter of law.[3] In response, Ms. Glaese asserted "the doctrine of Active Fraudulent Concealment," Record at 45, and

---

3. Indiana Trial Rule 56(C) was amended, effective January 1, 1991, to require the parties to designate both the claimed outcome-determinative issues of fact and evidence relevant thereto. The requirements of designation are equally applicable to both the movant and non-movant.

Furthermore, "[n]o judgment rendered on the motion shall be reversed on the ground that there is a genuine issue of material fact unless the material fact and the evidence relevant thereto shall have been specifically designated to the trial court." Ind.Trial Rule 56(H).

designated interrogatory answers alleging that Dr. Hughes failed to communicate to her the findings of the September 28, 1989, chest X-ray, and that Dr. Hughes affirmatively assured her that everything was "okay." Record at 60. However, she presents no evidence from which a finder of fact might reasonably infer that Dr. Hughes had actual knowledge of the X-ray findings, that he intentionally concealed the results from her, or that his statement that she was "okay" was calculated to prevent inquiry or to mislead her. We find that the doctrine of active fraudulent concealment does not arise from the facts presented by the plaintiff. No genuine issue of material fact exists with regard to either the doctrine of active fraudulent concealment or the medical malpractice statute of limitations, and the defendant is entitled to judgment as a matter of law.

Transfer is granted. This cause is remanded to the trial court with instructions that the defendant's motion for summary judgment be granted.

SHEPARD, C.J., and DeBRULER, SULLIVAN and SELBY, JJ., concur.