**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Jun 14 2013, 8:28 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEYS FOR APPELLANT:

**MARK D. GERTH**
**DONALD L. DAWSON**
Kightlinger & Gray, LLP
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**DAVID D. BECSEY**
Zeigler Cohen & Koch
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| LARRY ROBERT DAVID, II, AS SPECIAL ADMINISTRATOR OF THE ESTATE OF LISA MARIE DAVID, DECEASED, | ) ) ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) | No. 49A02-1301-MI-13 |
| WILLIAM KLECKNER, M.D., | ) ) ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Timothy W. Oakes, Judge
Cause No. 49D13-1208-MI-30944

**June 14, 2013**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**BARNES, Judge**

**Case Summary**

Larry David, II, special administrator of the Estate of Lisa Marie David ("the Estate"), appeals the trial court's grant of summary judgment to William Kleckner, M.D. We affirm.

**Issues**

The Estate raises two issues, which we restate as:

  I.    whether the Estate's medical malpractice claim against Dr. Kleckner was barred by the statute of limitations; and

  II.   whether the doctrine of fraudulent concealment bars Dr. Kleckner from asserting the statute of limitations defense.

**Facts**

Lisa was a patient of Dr. Kleckner, who is a family physician. In November 2008, as part of Lisa's annual examination, Dr. Kleckner performed a pap smear, and the cells were sent to a pathologist for evaluation. The pathologist's report, which was sent to Dr. Kleckner, revealed an "Epithelial cell Abnormality—Glandular" with a descriptive diagnosis of "Atypical endocervical cells." App. p. 282. Dr. Kleckner performed a repeat pap smear on January 28, 2009. The pathologist again found an "Epithelial cell Abnormality—Glandular" with a descriptive diagnosis of "Atypical endometrial cells." Id. at 283. The pathologist commented that an "[e]ndocervical and endometrial biopsy is recommended if clinically indicated." Id.

On February 27, 2009, Dr. Kleckner performed an endometrial biopsy on Lisa, but he did not perform an endocervical biopsy. The pathologist found "no evidence of

2

carcinoma, hyperplasia, or atypia" in the endometrial biopsy. Id. at 271. Dr. Kleckner had his assistant call Lisa and inform her that "all [was] OK" and direct Lisa to "call if any spotting or other gyn problems" occur. Id. Dr. Kleckner's assistant called Lisa on March 13, 2009.

In August 2009, Lisa developed abdominal pain and vaginal bleeding. She scheduled an appointment with a gynecologist, Dr. Keith Bean, for September 1, 2009. Dr. Bean's records reflect that Lisa was referred to his office by Dr. Kleckner. Dr. Bean found a mass on Lisa's cervix and performed an endocervical biopsy. The pathologist found that the mass was "Invasive moderate to poorly differentiated adenosquamous cell carcinoma." Id. at 272. Dr. Bean informed Lisa of the diagnosis on September 3, 2009. On September 11, 2009, Lisa spoke with Dr. Kleckner, who told Lisa there was no tumor present on February 27, 2009.

Lisa obtained treatment, which included radiation and chemotherapy, at the Indiana University Cancer Center. On December 16, 2009, Lisa was told that her cervix looked normal and that the tumor was gone. However, a pap smear in March 2010 revealed abnormal cells again. Lisa had a hysterectomy in April 2010. Another pap smear in August 2010 again revealed abnormal cells, and Lisa started another course of radiation and chemotherapy. However, the treatments were unsuccessful, and Lisa died on March 25, 2011. After Lisa died, her husband, Larry, learned that the pathologist had recommended an endocervical biopsy in February 2009, but that Dr. Kleckner did not perform the biopsy.

3

The Estate filed a proposed medical malpractice complaint against Dr. Kleckner with the Department of Insurance on July 1, 2011. On August 7, 2012, Dr. Kleckner filed a motion for preliminary determination and a motion for summary judgment, alleging that the Estate's claim was barred by the statute of limitations. The trial court granted Dr. Kleckner's motion for summary judgment. The Estate now appeals.

**Analysis**

The Estate argues that the trial court erred by finding its medical malpractice claim against Dr. Kleckner was barred by the statute of limitations. The entry of summary judgment on a motion for a preliminary determination is subject to the same standard of appellate review as any other entry of summary judgment. Boggs v. Tri-State Radiology, Inc., 730 N.E.2d 692, 695 (Ind. 2000). The standard of appellate review of a summary judgment ruling is the same as that used in the trial court: summary judgment is appropriate only where the evidence shows that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law. Id.; Ind. Trial Rule 56(C). All facts and reasonable inferences drawn from those facts are construed in favor of the nonmoving party. Boggs, 730 N.E.2d at 695. "When the moving party asserts the statute of limitations as an affirmative defense, however, and establishes that the action was commenced beyond the statutory period, the burden shifts to the nonmovant to establish an issue of fact material to a theory that avoids the defense." Id.

**I. Statute of Limitations**

The Indiana Medical Malpractice Act's two-year statute of limitations runs from the date of the negligent act or omission. Ind. Code § 34-18-7-1(b); Herron v. Anigbo,

4

897 N.E.2d 444, 448 (Ind. 2008). Our supreme court has concluded that this occurrence-based limitations period is constitutional on its face. Herron, 897 N.E.2d at 448 (citing Johnson v. St. Vincent Hosp., Inc., 273 Ind. 374, 403-04, 404 N.E.2d 585, 603-04 (1980)). However, in Martin v. Richey, 711 N.E.2d 1273, 1279 (Ind. 1999), our supreme court held "that the statute denied any remedy and therefore violated the Indiana Constitution if applied to bar the claim of a patient who could not reasonably be expected to learn of the injury within the two-year period." Herron, 897 N.E.2d at 448. The court "later held that the same applies to a patient who knows of the injury but is unable in exercise of 'reasonable diligence' to attribute it to malpractice." Id. (quoting Booth v. Wiley, 839 N.E.2d 1168, 1172 (Ind. 2005)).

In Herron, the court described the time at which a patient "either (1) knows of the malpractice and resulting injury or (2) learns of facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury" as the "trigger date." Id. at 448-49. A plaintiff whose trigger date is after the original limitations period has expired may institute a claim for relief within two years of the trigger date. Id. at 449. If the trigger date is "within two years after the date of the alleged malpractice, the plaintiff must file before the statute of limitations has run if possible in the exercise of due diligence." Id. Finally, "[i]f the trigger date is within the two-year period but in the exercise of due diligence a claim cannot be filed within the limitations period, the plaintiff must initiate the action within a reasonable time after the trigger date." Id. Like many legal issues turning on "reasonable" conduct, the determination of the trigger date may raise issues of fact but often may be resolved as a

5

matter of law. Id. at 450. "The trigger date becomes a matter of law when it is clear that the plaintiff knew, or should have known, of the alleged symptom or condition, and facts that in the exercise of reasonable diligence would lead to discovery of the potential of malpractice." Id.

The Estate argues that it did not discover Dr. Kleckner's alleged negligence until after Lisa's March 2011 death and that the trigger date was when it learned of Dr. Kleckner's failure to perform the endocervical biopsy. Thus, according to the Estate, its July 2011 complaint was filed within two years of the trigger date. Dr. Kleckner argues that the statute of limitations began to run on February 27, 2009, when Dr. Kleckner failed to perform the endocervical biopsy. Further, Dr. Kleckner argues that the trigger date was September 3, 2009, when Lisa learned that she had endocervical cancer. According to Dr. Kleckner, because the trigger date was prior to the expiration of the occurrence-based limitations period, the claim is barred because the complaint was not filed by February 27, 2011.

In Overton v. Grillo, 896 N.E.2d 499 (Ind. 2008), our supreme court addressed a similar issue. There, Christine Overton had a routine mammogram on July 7, 1999, and Dr. Marshall Grillo found that the mammogram was normal. However, on October 2, 2000, Overton was diagnosed with breast cancer that had metastasized to the lymph nodes. She learned for the first time on October 11, 2001, of the possibility of negligence regarding Dr. Grillo's interpretation of the July 1999 mammogram. She filed a medical malpractice suit against Dr. Grillo on October 19, 2001.

6

The trial court granted summary judgment to Dr. Grillo based on the statute of limitations. On appeal, our supreme court held that the trigger date was October 2, 2000, when Overton learned that she had cancer. "[A]lthough no professional had advised the Overtons of possible malpractice, the metastasized cancer brought to light the potential that the earlier mammogram had been misread." Overton, 896 N.E.2d at 504. "A plaintiff need not be advised of the possibility of malpractice where it should be obvious that it might be present." Id. at 503. Because the trigger date was within two years after the date of the alleged malpractice, Overton was required to file her claim before July 7, 2001, if possible in the exercise of due diligence. In October 2000, Overton had nine months remaining in the limitations period to file her claim, but she did not file her claim until October 2001. The court rejected Overton's argument that she was incapacitated due to the cancer treatments and unable to file within that time period. Because she did not file her claim until October 2001, her claim was barred by the statute of limitations.

The court reached a similar result in Boggs. There, Carolyn Boggs discovered a lump in her breast in July 1991. After having a mammogram done, she was instructed to return in one year. On July 28, 1992, she had a second mammogram. She learned on August 12, 1992, that she had breast cancer that had metastasized to her liver. Boggs died on July 28, 1993, and her husband filed a medical malpractice claim on July 1, 1994. The trial court granted summary judgment to the radiologist based on the statute of limitations. On appeal, our supreme court held that Boggs "became aware of her injury eleven months before the statute of limitations expired." Boggs, 730 N.E.2d at 695. The

7

court held that the patient "could have filed a claim within the two-year limitations period prescribed by the Medical Malpractice Act, but did not." Id.

Finally, in Herron, our supreme court noted:

> [I]f the patient cannot with reasonable diligence learn of the injury before the statute has expired, the date on which the patient learns of the injury and the prior treatment starts the limitations period, even if there is no basis to allege malpractice at that point. Thus, in Martin [v. Richey, 711 N.E.2d 1273 (Ind. 1999)], the limitations period started when breast cancer was identified, because the patient was in a position to uncover the failure to identify it in an earlier mammogram, even if the patient at that point had no indication whether the earlier mammogram suggested her cancer.

Herron, 897 N.E.2d at 450.

Similarly, here, Dr. Kleckner's alleged negligence occurred in February 2009, making the occurrence-based statute of limitations February 2011. Lisa discovered that she had cancer on September 3, 2009. Given the short amount of time between the pap smears and biopsy performed by Dr. Kleckner and Lisa's diagnosis with cancer, Lisa was aware of facts that, in the exercise of reasonable diligence, should have led to a discovery of the alleged malpractice. According to Boggs and Overton, Lisa had enough information to put her on notice of the possibility of malpractice, and the trigger date was September 3, 2009, when Lisa discovered she had cancer.

Because the trigger date is within two years after the date of the alleged malpractice, Lisa was required to file her claim before February 2011 if possible in the exercise of due diligence. Lisa had eighteen months between her September 2009 diagnosis and February 2011 within which to file her claim. The Estate seems to argue

8

that Lisa could not file her claim in a timely manner because of the financial stress from her treatments. Our supreme court addressed a similar argument in Overton, 896 N.E.2d at 504. The court noted there was no designated evidence that Overton's severe depression, anxiety, and sleep deprivation as she went through chemotherapy and radiation treatments amounted to an ongoing incapacity as a matter of law. Similarly, here, the Estate cites no support for its argument that Lisa's financial stress amounted to an ongoing incapacity.

The Estate argues that we should, instead, rely on Van Dusen v. Stotts, 712 N.E.2d 491 (Ind. 1999), and Booth v. Wiley, 839 N.E.2d 1168 (Ind. 2005).[1] In Van Dusen, the patient underwent a biopsy of a tumor on his prostate in July 1992. A pathologist found that the tumor was benign. However, the patient was diagnosed with incurable prostate cancer in January 1995. At that time, his physician said it was a "possibility" that the 1992 biopsy was "improperly read." Van Dusen, 712 N.E.2d at 494. In January 1996, it was confirmed that the 1992 biopsy was "badly misread." Id. The patient filed his claim against the pathologist in April 1996. Our supreme court held that the plaintiff's claim

---

[1] The Estate argues that Boggs and Overton are distinguishable because neither involved the negligence of a physician with an ongoing patient-physician relationship and Kleckner had a fiduciary duty to inform her of the recommended biopsy. The ongoing patient-physician relationship and failure to inform are generally relevant to the Estate's fraudulent concealment argument. However, the Estate does not cite authority for the proposition that they are relevant in determining whether application of the statute of limitations is constitutional. In fact, our supreme court has cautioned against intermixing those theories. See Booth, 839 N.E.2d at 1175 ("Because the court's rationale intermixed the analysis applicable to the theory of fraudulent concealment with that applicable when malpractice is discovered less than two years after its occurrence, we believe this decision is not helpful.").
The Estate also argues that Boggs and Overton departed from the holdings in Van Dusen and Booth, and that we should follow Van Dusen and Booth. Even if the Estate is correct, we are bound to follow the supreme court's latest pronouncement, which is Overton.

9

was timely because the two-year period began to run in January 1995 when the plaintiff was diagnosed with cancer and told of the possibility that the 1992 biopsy was misread.

According to the Estate, Van Dusen stands for the proposition that the trigger date is the date on which the patient has knowledge of both his or her disease and the possibility of a misread test. However, Overton clarified that knowledge of the possibility of malpractice is not necessary "where it should be obvious that it might be present." Overton, 896 N.E.2d at 503.

In Booth, Dr. Robert Wiley performed Lasik surgery on a patient in November 1998 and February 1999, and the patient had preexisting cataracts and glaucoma. Dr. Wiley also performed cataract surgeries on the patient's right eye. Complications left the patient nearly blind in his right eye. He was referred to another eye surgeon in December 2000, who informed him that Lasik surgery should not have been performed because of the preexisting cataracts and glaucoma. In July 2001, the patient filed a medical malpractice action.

Our supreme court held that "[t]he evidence does not indisputably establish that [the patient] discovered the malpractice and resulting injury, or acquired knowledge sufficient to lead a reasonably diligent person to discover the malpractice and resulting injury, until December 4, 2000," when he was advised that the Lasik surgery should not have been performed. Booth, 839 N.E.2d at 1175. Although the patient had knowledge that he had serious vision problems and probably permanent vision impairment, his symptoms were "reasonably attributable" to his preexisting conditions. Id. at 1176. Because the trigger date occurred outside the two-year occurrence-based statute of

10

limitations, the patient had two years from the trigger date to file his claim.  The patient

thus filed a timely claim in July 2001.

The court noted:

> [W]e are not holding that an expert's advice is always required to put a patient on notice that problems may be due to malpractice.  In fact, in most cases, such advice is not required.  It is true in this case because the symptoms were reasonably attributable to [the patient's] pre-treatment condition.  But in many cases, the malpractice produces conditions that reasonably suggest the possibility of malpractice without any expert advice.  As noted in our discussion above, the discovery date will be triggered when a patient either (1) knows of the malpractice and resulting injury or (2) learns of facts that, in the exercise of reasonable diligence, should lead to the discovery of the malpractice and the resulting injury.  This does not necessarily require a medical advisement, but may arise from a patient's ordinary experiences and observations, provided that these facts are such that they do or should reasonably lead to the discovery of the malpractice and resulting injury.

Id.

We conclude that Booth is distinguishable from this case.  In Booth, the patient

had preexisting conditions that masked his injuries from the eye surgeon's alleged

negligence.  Those unusual circumstances are not present here.  Once Lisa discovered

that she had cancer, according to Boggs and Overton, she was on notice of the possibility

of negligence by Dr. Kleckner.  Lisa did not have a preexisting condition to which the

cancer could have been reasonably attributable.

We are most sympathetic to the Davids' predicament.  However, clear precedent

from our supreme court unmistakably tells us that the medical malpractice claim was not

11

timely. We conclude that the trial court properly granted Dr. Kleckner's motion for summary judgment regarding the statute of limitations.

## II. Fraudulent Concealment

Next, the Estate argues that the doctrine of fraudulent concealment bars Dr. Kleckner from asserting the statute of limitations defense. Under the doctrine of fraudulent concealment, "a person is estopped from asserting the statute of limitations as a defense if that person, by deception or violation of a duty, has concealed material facts from the plaintiff and thereby prevented discovery of a wrong." Boggs, 730 N.E.2d at 698 (citing Hughes v. Glaese, 659 N.E.2d 516, 519 (Ind. 1995)). "If the concealment is active, it is tolled until the patient discovers the malpractice, or in the exercise of due diligence should discover it." Id. "If the concealment is constructive, in this case by reason of an ongoing duty arising from the continuing physician-patient relationship, the statute of limitations is tolled until the termination of the physician-patient relationship, or, as in the active concealment case, until discovery, whichever is earlier." Id. "Constructive concealment consists of the failure to disclose material information to the patient." Id. "Active concealment involves affirmative acts of concealment intended to mislead or hinder the plaintiff from obtaining information concerning the malpractice." Id. "Under either strand of the doctrine, the patient must bring his or her claim within a reasonable period of time after the statute of limitations begins to run." Id.

In Boggs, our supreme court rejected a similar fraudulent concealment theory. There, the court held that, even if discovery were to establish that a continuing physician-patient relationship existed between the radiologist and the patient, "the statute of

12

limitations would not be tolled beyond August 12, 1992, the date of [the patient's] biopsy and knowledge of facts that led to the discovery of alleged malpractice." Id. at 699. The patient would have only a reasonable time beyond August 1992 to file her claim. Id. In August 1992, eleven months remained under the occurrence-based statute of limitations. Id. Boggs did not file his proposed complaint until July 1994, twenty-two and one-half months later. Id. The court held, "[a]lthough this Court is sympathetic to Boggs' predicament, there is nothing in the circumstances of this case to indicate that [twenty-two and one-half] months was a reasonable time to delay filing suit." Id. Thus, the doctrine of fraudulent concealment did not bar the physician from asserting the statute of limitations as a defense. Id.

Here, the Estate alleges constructive concealment by Dr. Kleckner's failure to disclose that an endocervical biopsy was recommended in February 2009. The Estate argues that the physician-patient relationship between Lisa and Dr. Kleckner did not terminate until her death because Dr. Kleckner continued to receive and review reports on her treatments. As in Boggs, even if we assume that the physician-patient relationship continued and that Dr. Kleckner failed to disclose material information to Lisa, the statute of limitations would not be tolled beyond September 2009, the date that Lisa was diagnosed with cancer. "In the medical malpractice context, the doctrine of fraudulent concealment may operate to toll the statutory period until the termination of the physician-patient relationship, or until the patient did discover, or in the exercise of reasonable diligence should have discovered, the doctor's alleged malpractice." Weinberg v. Bess, 717 N.E.2d 584, 590 (Ind. 1999). In September 2009, Lisa, in the

13

exercise of reasonable diligence, was put on notice that there was a significant problem and should have discovered Dr. Kleckner's alleged malpractice.

Under these circumstances, the doctrine of fraudulent concealment does not bar Dr. Kleckner from asserting the statute of limitations defense. We conclude that the trial court properly granted summary judgment to Dr. Kleckner regarding the doctrine of fraudulent concealment.

## Conclusion

The trial court properly found that the Estate's medical malpractice claim against Dr. Kleckner was barred by the statute of limitations. Further, the trial court properly found that the doctrine of fraudulent concealment does not bar Dr. Kleckner from asserting the statute of limitations defense. The trial court properly granted Dr. Kleckner's motion for summary judgment. We affirm.

Affirmed.

NAJAM, J., and BAILEY, J., concur.