## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Dec 30 2016, 8:16 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Ronald J. Waicukauski
Carol Nemeth Joven
Price Waicukauski Joven & Catlin, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Debra H. Miller
James R. Fisher
Miller & Fisher, LLC
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Linda H. Havel, <br> *Appellant-Plaintiff,* <br><br> v. <br><br> Vaughan & Vaughan and Charles V. Vaughan, <br> *Appellees-Defendants.* | December 30, 2016 <br><br> Court of Appeals Case No. <br> 49A02-1605-CT-1101 <br><br> Appeal from the Marion Superior Court <br><br> The Honorable Cynthia J. Ayers, Judge <br><br> Trial Court Cause No. <br> 49D04-1204-CT-14369 |

**Bradford, Judge.**

# Case Summary

In April of 2012, Appellant-Plaintiff Linda H. Havel brought suit against her former employers, Appellees Vaughan & Vaughan and Charles V. Vaughan (collectively, "the Appellees"), alleging a breach of the parties' employment contract. Specifically, Havel, who was employed by the Appellees as a non-equity partner from November 1, 2007 to January 20, 2012, argued that the Appellees had breached the parties' employment contract by failing to compensate Havel according to its terms. On April 26, 2016, the trial court granted the Appellees' partial motion for summary judgment with respect to Havel's claims arising from the years 2008 and 2009, concluding that the claims were barred by the applicable two-year statute of limitations.

On appeal, Havel contends that the trial court erred by doing so because the statute of limitations should have been tolled pursuant to the doctrine of fraudulent concealment, the discovery rule, or the doctrine of equitable estoppel. Concluding that the trial court erred in granting the Appellees' motion for partial summary judgment, we reverse the judgment of the trial court and remand the matter to the trial court for further proceedings.

# Facts and Procedural History

Havel was employed by the Appellees as a non-equity partner from November 1, 2007 to January 20, 2012. At some point near the end of 2008, Havel requested Vaughan & Vaughan's ("the Firm") tax documents. Despite Havel's

request, Vaughan did not provide Havel with any of the Firm's financial records. Havel also inquired into the Firm's expenses, specifically asking Vaughan if he had charged personal expenses to the Firm. Vaughan responded that he had not charged any personal expenses to the Firm and indicated that it cost $500,000 per year to run the Firm. Because Havel (1) had known Vaughan for a number of years, (2) trusted what he told her to be true, and (3) did not have any reason to distrust Vaughan, Havel made no further requests for the firm's financial records or inquire into whether Vaughan was charging personal expenses to the firm.

[4] Havel resigned from her position with the Firm on January 20, 2012. After her resignation, her personal accountant advised her that because she had been classified as a "partner" of the Firm, she should retain a copy of the Firm's tax returns for the years 2008 through 2011 in her business files. Havel's requests for these documents were initially denied by the Appellees. However, on March 6, 2012, Vaughan provided Havel with a copy of the Firm's tax returns for the years 2008 through 2011.

[5] Upon review of these documents, Havel discovered that despite Vaughan's statement indicating otherwise, Vaughan had appeared to charge at least $308,877 in non-business related personal expenses against the Firm during the four years in question. These personal expenses included:

> credit card charges for trips to Napa Valley, California, Florida, Chicago, Atlanta, Wisconsin, Illinois, New York, and Masters Golf Tournament including vacations taken over the 4th of July,

Spring Break, Christmas and New Years [sic]; charges for regular liquor purchases; charges for weekends at [Vaughan]'s lake house in Culver, Indiana; charges for daily meals and daily gas; charges for personal car repairs, car licenses, car registration, plates and insurance for multiple cars for [Vaughan] and a 1998 Aurora for [Vaughan's father]; charges for expensive dinners, hotel charges and groceries during [Vaughan's] son's travel swim meets all over the state of Indiana; car leases charged to the firm for a GMC Yukon, 2004 BMW 535XI, and 2008 BMW; $42,000 in cash paid for a 2008 Cadillac; thousands of dollars for sporting tickets to Purdue football and basketball events; monthly account charges for non-business related meals at the Other Pub; contributions made to organizations personal to [Vaughan], his wife, his minor son and his father; country club dues for multiple country clubs including the Carlton in Chicago, Illinois; his Mother's airplane; his Father's pontoon boat, and multiple unexplained adjusted journal entries.

Appellant's App. Vol. 2, pp. 116-17.

[6]     On April 10, 2012, Havel brought suit against the Appellees, alleging a breach of the parties' employment contract. Specifically, Havel argued that the Appellees had breached the parties' employment contract by failing to accurately compensate her according to the contract's terms. The Appellees filed a motion for partial summary judgment on January 5, 2016, arguing that Havel's claims relating to compensation or the years 2008 and 2009 were barred by the applicable two-year statute of limitations. Havel subsequently file a response in opposition to the Appellees' motion.

[7] The trial court conducted a hearing on the Appellees' motion on April 20, 2016. Six days later, on April 26, 2016, the trial court issued an order granting the Appellees' motion for partial summary judgment. This appeal follows.

# Discussion and Decision

[8] On appeal, Havel contends that the trial court erred in granting the Appellees' motion for partial summary judgment, arguing that the trial court erred in finding, as a matter of law, that her breach of contract claims relating to the years 2008 and 2009 were barred by the applicable two-year statute of limitations.

## I. Standard of Review

Summary judgment is appropriate only where no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Settles v. Leslie*, 701 N.E.2d 849, 852 (Ind. Ct. App. 1998). Genuine issues of material fact exist where facts concerning an issue which would dispose of the litigation are in dispute. *Settles*, 701 N.E.2d at 852. The moving party has the initial burden of demonstrating, prima facie, the absence of genuine issues of material fact. *Id*. If the moving party does so, the burden then falls upon the non-moving party to identify a factual dispute which would preclude summary judgment. *Id*. Upon appeal of a grant of summary judgment, we apply the same standard as the trial court, resolving any factual disputes or conflicting inferences in favor of the non-moving party. *Id*. We consider only those portions of the record specifically designated to the trial court. *Id*. Upon appeal, the non-moving party bears the burden of persuasion and must specifically point to the disputed material facts and the designated evidence pertaining thereto. *Id*. We will

> liberally construe the designated evidence in favor of the non-movant, so that [s]he is not improperly denied [her] day in court. *Id.*

*Meisenhelder v. Zipp Exp., Inc.*, 788 N.E.2d 924, 926-27 (Ind. Ct. App. 2003).

## II. Analysis

[9] In challenging the trial court's award of partial summary judgment in favor of the Appellees, Havel asserts that an issue of material fact remains as to whether the statute of limitations was tolled by fraudulent concealment, the discovery rule, or the doctrine of equitable estoppel.[1] When a statute of limitation defense is asserted and presumptively established by a defendant in a summary judgment motion, the burden shifts to the plaintiff to establish that the claim has been timely brought. *Doe v. Shults-Lewis Child & Family Servs., Inc.*, 718 N.E.2d 738, 745 (Ind. 1999). As such, on review, we must determine whether

---

[1] To the extent that the Appellees question whether Havel could raise these equitable defenses to their assertion that some of Havel's claims were time barred after not including the equitable defenses in her complaint, we observe that the Indiana Supreme Court has held the following:

> Initially, a plaintiff need not anticipate a statute of limitations defense and plead matter[s] in avoidance in the complaint. If the complaint shows on its face that the statute of limitations has run, the defendant may file a T.R. 12(B)(6) motion. Plaintiff may then amend to plead the facts in avoidance. On the other hand, if the defendant simply answers the complaint setting up the statute of limitations, the plaintiff may, but does not have to, file a reply in avoidance. The defendant may seek summary judgment, in which event it becomes incumbent upon the plaintiff to present facts raising a genuine issue in avoidance of the statute of limitations. If the case goes to trial, the plaintiff must establish the facts in avoidance of the statute of limitations.

*Nichols v. Amax Coal Co.*, 490 N.E.2d 754, 755 (Ind. 1986) (quoting *Nichols v. Amax Coal Co.*, 482 N.E.2d 776, 778 (Ind. Ct. App. 1985) (Ratliff, J., dissenting to denial of rehearing.)).

Havel designated evidence before the trial court which created an issue of material fact as to whether the running of the applicable statute of limitations was tolled by any of the above-asserted doctrines.

## A. Fraudulent Concealment

[10] "For centuries, our justice system has operated under the principle that a person who commits fraud should not be permitted to gain thereby." *Alldredge v. Good Samaritan Home, Inc.*, 9 N.E.3d 1257, 1261 (Ind. 2014). "As applied to statutes of limitation, this principle means 'the statute in good conscience cannot run until the party has a right to commence his suit, and that right cannot accrue in the case of fraud, until the injured party is informed of the injury done or fraud committed.'" *Id.* (quoting *Raymond v. Simoson*, 4 Blackf. 77, 85 (Ind. 1835)).

> Fraudulent concealment is an equitable doctrine which operates to prevent a defendant from asserting the statute of limitations as a bar to a claim where the defendant, by his own actions, prevents the plaintiff from obtaining the knowledge necessary to pursue a claim. [*Shults-Lewis*, 718 N.E.2d at 744-45]. When this occurs, equity will toll the statute of limitations until the equitable grounds cease to operate as a reason for delay. *Id.* at 745. The fraudulent concealment exception does not establish a new date for the commencement of the statute of limitations, but instead creates an equitable exception. *Fager v. Hundt*, 610 N.E.2d 246, 251 (Ind. 1993). Under this equitable exception, instead of a full statutory limitations period within which to act, a plaintiff must exercise due diligence in commencing his action after the equitable grounds cease to operate as a valid basis for causing delay. *Id.* Therefore, a plaintiff must institute an action within a reasonable time after he discovers information which would lead to discovery of the cause of action. *Southerland v. Hammond*, 693 N.E.2d 74, 78 (Ind. Ct. App. 1998).

*Meisenhelder*, 788 N.E.2d at 931.

[11]     As far back as 1843, the Indiana General Assembly has adopted a statutory provision codifying the common law principle that the fraudulent concealment of wrongdoing by one party should toll the statute of limitations. *Alldredge*, 9 N.E.3d at 1261-62. Currently, Indiana Code section 34-11-5-1 provides that "[i]f a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at any time within the period of limitation after the discovery of the cause of action."

> The type of concealment necessary for operation of the statute has long been defined:
>> "'It must appear that some trick or artifice has been employed to prevent inquiry or elude investigation, or calculated to mislead and hinder the party entitled from obtaining information, by the use of ordinary diligence, that a right of action exists; or it must appear that the facts were misrepresented to or concealed from the party, by some positive acts or declarations, when inquiry was being made or information sought....' [Citation omitted]."
>
> *Basinger v. Sullivan* (1989), Ind. App., 540 N.E.2d 91, 94.

*Chaiken v. Eldon Emmor & Co.*, 597 N.E.2d 337, 341-42 (Ind. Ct. App. 1992). The burden is placed "squarely on the plaintiff" to prove fraudulent concealment. *Shults-Lewis*, 718 N.E.2d at 748.

[12]     "The genus fraudulent concealment comprises two species:  active and passive." *Lyons v. Richmond Cmty. Sch. Corp.*, 19 N.E.3d 254, 260 (Ind. 2014) (citing *Hughes v. Glaese*, 659 N.E.2d 516, 519 (Ind. 1995)). "Active fraudulent

concealment requires a showing that the defendant (1) had actual knowledge of the alleged wrongful act and (2) intentionally concealed it from the plaintiff (3) by making some statement or taking some action 'calculated to prevent inquiry or to mislead,' [*Hughes*, 659 N.E.2d at 522], (4) upon which the plaintiff reasonably relied. *Doe v. United Methodist Church*, 673 N.E.2d 839, 845 (Ind. Ct. App. 1996)." *Id*. at 260-61. "Passive fraudulent concealment requires (1) a relationship between the parties such that the defendant has a duty to disclose the alleged wrongful act to the plaintiff and (2) a breach of that duty." *Id*. at 261 (citing *Guy v. Schuldt*, 236 Ind. 101, 109, 138 N.E.2d 891, 895 (1956)).

[13] Here, the record reveals that Havel designated evidence raising an issue of material fact as to whether the Appellees committed active fraudulent concealment. Havel designated her affidavit, in which she averred the following:

> 8. Vaughan told me that he would pay me one-third of the profits as my compensation and said that he would pay me a minimum share of $110,000.…
> 9. … [Vaughan] said that I was not responsible for generating business for the firm, paying any expenses, or having any type of managerial responsibility other than to be the attorney in the firm's Indianapolis office and work the cases.
> ****
> 13. … I worked at Vaughan and Vaughan continuously from November 1, 2007, to January 20, 2012.
> ****

19. At the end of 2008, I asked Charlene [Beaver][2] for my copy of the partnership tax returns. She stated that it was her understanding that I was not entitled to a copy of the returns because I was a non-equity partner. She said I could ask [Vaughan] for a copy and that he could give them to me if he chose to.

20. I called [Vaughan] and asked him for a copy of the partnership tax returns. I told him Charlene had told me I was not entitled to a copy because I was a non-equity partner but that he could give me a copy of [sic] he wanted to. [Vaughan] said "that's about right." He then asked me why I wanted a copy and I told him that I thought I should have a copy and he said he didn't know where they were and it's his family's firm, and I didn't need them.

21. In this same conversation, I inquired about my year end compensation because I thought it seemed low based on the cases that I knew had settled that year. [Vaughan] said that due to overhead, the amount was correct. I asked what it cost to run the firm and he said $500,000 per year. *I asked him if he was charging personal expenses to the firm and he said no.*

22. The entire conversation was uncomfortable and [Vaughan] did not like me asking these questions. At the time, I had known [Vaughan] for almost 10 years and considered him to be like an older brother. *I had no reason to distrust [Vaughan], and I believed what he told me was true.* So, after this conversation, I did not question [Vaughan] again about whether he was charging personal expenses to the firm. For this same reason, I never demanded to see the books because I saw no reason to ask to see them.

23. Thereafter, [Vaughan] never provided me with a copy of the firm's tax returns for 2008, and I never asked [Vaughan]

---

[2] Charlene Beaver worked as the Appellees' accountant.

again for a copy of the partnership returns because I thought I was not entitled to them because I was a non-equity partner.

Appellant's App. Vol. 2, pp. 106-09 (emphases added). Havel further averred as follows:

29.    During my period of employment from November 1, 2007 to January 20, 2012, I was never provided a copy of the books, tax returns or accounting documents for Vaughan and Vaughan.

30.    During my period of employment from November 1, 2007 to January 20, 2012, neither [Vaughan] nor Charlene Beaver, the firm's CPA, ever discussed any specific expenses with me and [Vaughan] always just told me the overhead was $500,000.

31.    During my period of employment from November 1, 2007 to January 20, 2012, I was never provided access to the summary records or source financial documents for all financial affairs of the firm.

32.    From November 1, 2007, to January 20, 2012, I was never informed of the exact profits of the firm or how my share was calculated and I was never provided with an accounting of the firm's net profit. I did not "concur" with any calculation because I was never involved in how any calculation was arrived at or informed of the same. I relied on [Vaughan]'s representations to me that what I was being paid was accurate and true, and on that basis, I accepted the share I was paid.

33.    From November 1, 2007, to January 20, 2012, I never had any control over any firm funds and I never had control or access to any firm bank account, nor was I ever told I could examine the firm's financial records. Additionally, neither [Vaughan] nor David Miller[3] ever told me I could have access to any financial records.

---

[3] David Miller served as the bookkeeper for Vaughan and Vaughan.

Appellant's App. Vol. 2, pp. 110-11. Havel also averred that (1) she was ultimately provided with a copy of the firm's tax returns for 2008-2011 on or about March 6, 2012, (2) it was not until she reviewed these tax returns that she realized that Vaughan had been untruthful when he indicated that he had not charged personal expenses against the firm, and (3) that in April of 2012, she filed the underlying action against the Appellees. Havel indicated that she believed that as a result of Vaughan's actions, her income was reduced by $102,596 over the course of her four-year term of employment with the firm.

[14] In addition to her affidavit, Havel also designated portions of the transcript of both hers and Vaughan's depositions which were taken in connection to the underlying breach of contract action. The relevant portions of Havel's deposition again indicated that she requested a copy of the Firm's tax documents for 2008 and that, at that time, she also inquired into the Firm's expenses. Havel indicated that Vaughan merely told her that "It costs $500,000" and "that's how much it costs." Appellant's App. Vol. 2, p. 157. Havel stated that she asked Vaughan "'[w]ell, is everything that we're paying for related to work and business related?' He told me yes." Appellant's App. Vol. 2, p. 157. Havel further stated that she did not ask to see a breakdown of all expenses because she "didn't think [she] needed to ask" because she "trusted what [Vaughan] told [her] was true." Appellant's App. Vol. 2, p. 157. Upon further questioning by counsel, the following exchange occurred:

> [Counsel]: Did you ask [Vaughan] to itemize the expenses for you?
> [Havel]: I didn't think I needed to ask him that. I asked him

what the expenses were; and he said they were all legitimate, that that's how much it cost to run the firm. I trusted what he told me was true.

****

[Counsel]: But you did absolutely nothing to follow up and obtain detail about what those expenses were to evaluate them yourself?

[Havel]: I did not feel that I needed to do that because I have known [Vaughan] for 14 years.

[Counsel]: Okay.

[Havel]: I trusted him implicitly. He told me there weren't any personal expenses. So I believed him.

****

[Havel]: … What I'm saying is, is that it never occurred to me that vacations, that liquor, that multiple car leases, that an airplane, that a boat, that nightly dinners out, it never occurred to me that those were being charged to the firm[.]

Appellant's App. Vol. 2, pp. 157-58. As for Vaughan, the transcript of his deposition indicates that he acknowledged that there may have been some personal expenses charged to the Firm. Vaughan also acknowledged that when questioned about expenses, he told Havel "this is what it costs every year." Appellant's App. Vol. 2, p. 163.

[15] Review of Havel's deposition testimony and averments are consistent. Havel stated on both occasions that (1) she was denied access to the Firm's 2008 tax documents; (2) when asked specifically by Havel, Vaughan asserted that he had not charged personal expenses to the Firm; and (3) Havel did not inquire into the Firm's expenses further because she trusted and believed Vaughan's assertions. These consistent statements, coupled with Vaughan's subsequent

acknowledgement that he "may" have charged personal expenses to the Firm, Appellant's App. Vol. 2, p. 160, are at odds with Vaughan's claims that he did not fraudulently conceal information relating to the Firm's finances from Havel.

It is of note that in the instant appeal, we need not decide whether such actions actually amounted to fraudulent concealment. Rather, we need only determine if an issue of material fact remains as to whether the actions amounted to fraudulent concealment. Keeping this in mind, we observe that, at the very least, an issue of material fact remains as to whether Vaughan's actions were calculated to mislead Havel as to the Firm's finances or to hinder her from discovering that he had, in fact, charged some personal expenses to the Firm. As such, we conclude that the facts of this case are sufficient to raise an issue of material fact as to whether the Appellees engaged in fraudulent concealment.[4]

The judgment of the trial court is reversed and the matter remanded to the trial court for further proceedings.

Vaidik, C.J., and Brown, J., concur.

---

[4] Having determined that an issue of material fact remains as to whether the applicable two-year statute of limitations was tolled by fraudulent concealment, we need not consider whether it was tolled by either the discovery doctrine or the doctrine of equitable estoppel.